FILED & ENTERED

MAY 17 2012

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY castro     DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

In re

**DAVID L. ARNOLD and
GRACE E. ARNOLD**,

Debtors.

Case No. 2:12-bk-15623-RK

Chapter 11

**MEMORANDUM DECISION RE DENIAL
OF APPROVAL OF THE DEBTORS'
AMENDED DISCLOSURE STATEMENT**

DATE:   April 25, 2012
TIME:    1:30 p.m.
PLACE:   Courtroom 1675
              255 E. Temple St.
              Los Angeles, CA  90012

On August 24, 2011, Debtors David L. Arnold and Grace E. Arnold filed a

Disclosure Statement and a proposed Chapter 11 Plan of Reorganization.  A hearing was

held on approval of the Disclosure Statement on September 28, 2011.  Issues regarding

the confirmability of the Plan were raised by creditor U.S. Bank, arguing that the court

should not approve the Disclosure Statement because the Plan violated the absolute

priority rule.  The hearing was continued, and the Debtors filed an Amended Disclosure

Statement and proposed Chapter 11 Plan of Reorganization dated and filed on October

14, 2011.  On November 16, 2011, the court held a hearing on the Amended Disclosure

Statement, where U.S. Bank objected on the same grounds.  That hearing was continued

1    to January 18, 2012.  Supplemental briefing was filed, and before that hearing, the court

2    vacated the January 18 hearing and took the matter under submission.

3    　　　　While the matter was under submission, the Bankruptcy Appellate Panel ("BAP")

4    of the Ninth Circuit, in a divided 2-1 decision, issued an opinion on March 19, 2012 in

5    *Friedman v. P+P, LLC (In re Friedman)*, 466 B.R. 471 (9th Cir. BAP 2012), which held

6    that the absolute priority rule does not apply in Chapter 11 bankruptcy cases of individual

7    debtors after the enactment of the Bankruptcy Abuse Prevention and Consumer

8    Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23 (2005).  On March

9    20, 2012, the court issued an order inviting further briefing from the parties in light of this

10   recent BAP decision.  A final hearing on the Debtors' Disclosure Statement was held on

11   April 25, 2012.  The court now enters this memorandum decision.

12   　　　　The court finds that the Amended Disclosure Statement does not contain

13   adequate information.  The court also concludes that the absolute priority rule applies in

14   this individual Chapter 11 bankruptcy case, and the court finds that the proposed Plan

15   would violate the absolute priority rule.  Therefore, the court denies approval of the

16   Amended Disclosure Statement.

17   **BACKGROUND**

18   　　　　The Debtors commenced their bankruptcy case by filing a voluntary Chapter 11

19   petition on March 3, 2011.  The Debtors are the co-trustors and co-trustees of the David

20   L. and Grace E. Arnold Trust Dated July 21, 2004 (the "Trust").[1]  The Trust is a revocable

21   trust that held title to several investment properties and the Debtors' current residence.

22   Soon after the Debtors' filing, a limited partnership named Full House Enterprises, L.P.

23   ("Full House") also filed a voluntary Chapter 11 petition.  Full House has a sophisticated

24

25   　　　　[1] Except as otherwise noted, the statement of facts in this background section is primarily
based on the *Stipulated Facts and Joint Exhibit List in Connection with Evidentiary Hearing on (1)*
26   *Objection to Claim of U.S. Bank and (2) Application of Absolute Priority Rule "Stipulated Facts"),*
filed on Nov. 4, 2011, and exhibits attached thereto, the Debtor's Schedules filed in this case and
27   the bankruptcy schedules filed by Full House Enterprises in its bankruptcy case, No. 2:12-bk-
16197 RK Chapter 11.

28

business structure in which B&D Real Estate, LLC ("B&D") is the general partner, the

Trust is the limited partner, and the Trust is also B&D's managing member. *Stipulated*

*Facts* at 2. Thus, both the Trust and Full House were completely controlled by the

Debtors. *Id.*

Through the Trust, the Debtors had acquired a number of investment properties.

The properties were highly leveraged as of the Petition Date:

1.  El Camino Business Center is multi-tenant office complex with 36,366 square feet

    of rentable space. The Debtors in their Schedules and Amended Disclosure

    Statement state that this property is valued at $5,434,000. The Debtors also state

    in these documents that the outstanding amount owing to U.S. Bank on the El

    Camino Business Center is $4,500,000 (including both the mortgage and the

    equity line of credit). Based on these figures of the Debtors, the loan-to-value ratio

    for the El Camino Business Center is approximately 82%. U.S. Bank on its proof

    of claim filed in this case asserts that as of the Petition Date, the outstanding

    amount owing to U.S. Bank on a loan secured by the El Camino property is

    $4,616,074.08. *Proof of Claim No. 22-1*, filed by U.S. Bank National Association

    on July 12, 2011. This amount includes the outstanding balance on the mortgage

    in the amount of $4,422,791.53 (including principal of $3,977,639.43, interest of

    $395,017.37, and late charges of $50,134.73) as well as the outstanding balance

    on the equity line of credit in the amount of $193,282.55 (including principal in the

    amount of $170,550.11, interest in the amount of $20,769.22, and late fees in the

    amount of $1,963.22). *Id.* Based on the Debtors' valuation in their Schedules and

    the outstanding balance figures of U.S. Bank, the loan-to-value ratio for the El

    Camino Business Center is approximately 85%.

2.  Treehaven Plaza is a multi-tenant office complex with 19,274 square feet of

    rentable space. The Debtors in their Schedules state that this property is valued

    at $2,795,000. The Debtors also state in these documents that the outstanding

    amount owing to U.S. Bank on this property is $2,770,000. Based on these

figures provided by the Debtors, the loan-to-value ratio for the Treehaven property is approximately 99%.[2]

3. Yorba Professional and Business Centers are two multi-tenant office buildings with a total of 17,453 square feet of rentable space.  The Debtors allege in their Schedules that the value of the Yorba Professional and Business Centers is $2,950,000 and the outstanding amount owing to U.S. Bank is $2,407,975.  U.S. Bank contends that as of the Petition Date, the outstanding amount owing to U.S. Bank on Yorba Professional and Business Centers is $2,667,708.76 (including principal of $2,387,661.49, interest of $248,543.10 and late charges of $34,504.17).  *Motion for Order Approving Stipulation for Relief from Stay (Docket No. 26)* at 3.  Using the Debtors' outstanding balance amounts, the loan-to-value ratio on the Yorba Professional Business Centers is approximately 82%.  Using U.S. Bank's outstanding balance amounts, the loan-to-value ratio on the Yorba Professional and Business Centers is approximately 90%.

4. Lido Sands Property is the Debtors' principal residence.  The Debtors allege in their Schedules and their Amended Disclosure Statement that the value of the Lido Sands Property is $1,300,000.  The Debtors allege in these documents that the outstanding amount owing to U.S. Bank on the Lido Sands Property is $1,200,000.  U.S. Bank contends that as of October 24, 2011, the outstanding amount owing to U.S. Bank on the Lido Sands Property is $1,256,313.16 (including principal of $1,190,607.77, interest of $22,170.93, and late charges of $43,534.46).  *Motion for Relief from the Automatic Stay filed by U.S. Bank (Docket No. 122)* at 7.  Using the Debtors' outstanding balance amounts, the loan-to-value ratio on the Lido Sands Property is approximately 92%.  Using U.S. Bank's

---

[2] U.S. Bank has alleged that the outstanding balance is $2,758,924.44 (including principal of $2,457,589.47, interest of $268,602.58 and late charges of $32,732.39).  *Proof of Claim No. 22-1.* Using U.S. Bank's outstanding balance amounts, the loan-to value ratio on Treehaven Plaza is approximately 98%.

outstanding balance amounts, the loan-to-value ratio on the Lido Sands property is approximately 97%.

5. Beacon Bay Property is a land lease from the City of Newport Beach and the Debtor's former residence. The Debtors allege in their Schedules and their Amended Disclosure Statement that the Beacon Bay Property's value is $3,495,000. The Debtors allege in these documents that the outstanding amount owing to Chase Home Finance, LLC ("Chase") on the Beacon Bay Property is $2,150,000 and the amount owing to U.S. Bank is $1,000,000. Therefore, using the Debtors' outstanding balance amounts, the loan-to-value ratio on the Beacon Bay Property is approximately 90%.[3]

U.S. Bank asserts liens on each of the Debtors' above-listed properties. Relief from the automatic stay has been granted as to Treehaven Plaza and the Yorba Professional and Business Centers, and a state court receiver is administering each of these properties.

On the Petition Date in this case, Full House held title to three other properties:

1. Costa Mesa Property, a commercial office building totaling 26,841 square feet. Full House listed in its Schedules that the value of the Costa Mesa Property is $5,000,000 and the outstanding amount owing on the property was $2,640,000. However, as of January 17, 2011, Full House valued the Costa Mesa Property at $3,261,000. *Debtor's Opposition to Motion for Relief from the Automatic Stay (Docket No. 131)* at 4.

2. Escondido Property consists of two office buildings totaling 28,770 square feet. Full House alleged in its Schedules that the value of the Escondido Property was $5,000,000 and the outstanding amount owing on the property was $3,423,000.

_____

[3] Chase contends that the amount owing on the Beacon Bay Property is $2,195,573.00 as of the Petition Date, including $164,778.99 in arrearages. *Claim 13*-1, filed by Chase Home Finance, LLC on April 12, 2011. U.S. Bank contends that, as of the Petition Date, the outstanding amount owing to U.S. Bank on the Beacon Bay Property is $978,763.10, including $5,989.86 in arrearages. *Proof of Claim No. 22-1.* Using the banks' outstanding balance amounts, the loan-to-value ratio on the Beacon Bay Property is also approximately 90%.

1    Full House subsequently valued the Escondido Property at $2,225,000 based

2    upon an offer allegedly received from an unrelated third party to purchase the

3    Escondido Property.  *Debtor's Opposition to Motion for Relief from the Automatic*

4    *Stay (Docket No. 131)* at 5.

5    3.  Indian Trail Property, a property that includes a 32-room hotel and restaurant, a

6        single family residence and vacant land.  Full House alleged in its Schedules that

7        the value of the Indian Trail Property was $5,000,000 and the outstanding amount

8        owing was $2,937,000.  This property was sold for $3,150,000 pursuant to

9        § 363(b).

10    Prior to the Petition Date, U.S. Bank made three loans to Full House: a loan on the

11    Costa Mesa Property, a First Loan on the Escondido Property and a Second Loan on the

12    Escondido Property, in the aggregate principal amount of $6,392,500.  As stipulated in

13    the *Amendment to Stipulation for Order (1) Authorizing Debtor's Use of Cash Collateral;*

14    *and (2) Adequate Protection to U.S. Bank National Association, filed on January 26, 2010*

15    *(Docket No. 79), and approved by this court on June 19, 2010 (Docket No. 96),* the

16    parties agreed that all pre-petition collateral would secure all of Full House's obligations

17    to U.S. Bank.  As of the Petition Date, Full House's obligations to U.S. Bank totaled

18    $6,665,178.67.  As such, by January 2011, the outstanding loan balance on the Costa

19    Mesa and Escondido properties was at least $1,179,178 more than their value.  Relief

20    from stay was granted on February 16, 2011, to allow U.S. Bank to foreclose (Docket No.

21    135).

22    The Debtors had personally guaranteed Full House's debt obligations to U.S.

23    Bank, which resulted in the bank asserting deficiency claims in the Debtors' bankruptcy

24    case.  The Amended Disclosure Statement lists this deficiency claim as the "Disputed

25    U.S. Bank Claim," which is defined as "the general unsecured claim in the amount of

26    $3,023,783.38 asserted by U.S. Bank against the Debtors as alleged guarantors of

27    certain debts of Full House."  *Amended Disclosure Statement* at 13.    The Debtors

28    objected to the Disputed U.S. Bank Claim, and by order entered on March 14, 2012, the

1  court overruled the Debtors' objection to this claim.  The court's order overruling the

2  objection is now final.

3      The Debtors are in the process of marketing their former residence, and as

4  discussed in their Amended Disclosure Statement, they propose in their Plan to retain

5  their current residence, the Lido Sands Property, and an investment property, the El

6  Camino Business Center.  *Id.* at 29.  U.S. Bank objects to the Amended Disclosure

7  Statement on grounds that it lacks adequate information and that it describes a Plan that

8  is patently unconfirmable.

9                          **DISCUSSION**

10 **I.    Lack of Adequate Information**

11     To approve a disclosure statement, the court must determine that it contains

12 "adequate information" as defined by Section 1125 of the Bankruptcy Code:

13     "adequate information" means information of a kind, and in sufficient
       detail, as far as is reasonably practicable in light of the nature and history
14     of the debtor and the condition of the debtor's books and records,
       including a discussion of the potential material Federal tax consequences
15     of the plan to the debtor, any successor to the debtor, and a hypothetical
       investor typical of the holders of claims or interests in the case, that would
16     enable such a hypothetical investor of the relevant class to make an
       informed judgment about the plan, but adequate information need not
17     include such information about any other possible or proposed plan and
       in determining whether a disclosure statement provides adequate
18     information, the court shall consider the complexity of the case, the
       benefit of additional information to creditors and other parties in interest,
19     and the cost of providing additional information . . . .
20

21 11 U.S.C. § 1125(a)(1).

22     The Amended Disclosure Statement and Plan identifies several Options that Class

23 5, which is composed of General Unsecured Creditors, may receive under the Plan.

24 *Amended Disclosure Statement* at 31-33.  The Options are mutually exclusive, and each

25 has a set of conditions under which it applies:

26 •  Option A:      If the Debtors' objection to the Disputed U.S. Bank Claim is

27     sustained in full and if the absolute priority rule does not apply.

28

- <u>Option B</u>:    If the Debtors' objection to the Disputed U.S. Bank Claim is overruled and if the absolute priority rule does not apply.

- <u>Option C</u>:    If the Debtors' objection to the Disputed U.S. Bank Claim is sustained in full and if the absolute priority rule applies.

- <u>Option D</u>:    If the Debtors' objection to the Disputed U.S. Bank Claim is overruled, if the absolute priority rule applies, and if the New Value Contribution is made.

- <u>Option E</u>:    If the Debtors' objection to the Disputed U.S. Bank Claim is overruled, if the absolute priority rule applies and if the New Value Contribution is not made.

*Id.*

Because the court has overruled the Debtors' objection to the Disputed U.S. Bank Claim, Option A and Option C are no longer relevant.  Option B is also not relevant because, as discussed below, the absolute priority rule applies in this case.  Therefore, in light of the court's rulings on the objection to the Disputed U.S. Bank's Claim and on the applicability of the absolute priority rule, the only relevant two Options are Option D and Option E.

Both Options mention the "New Value Contribution," which is stated to apply in some of the Options and not apply in others.  The Amended Disclosure Statement defines the "New Value Contribution" as follows:

> "<u>New Value Contribution</u>" means the sum of money that the Debtors may, at their election, deposit with the Estate on the Effective Date. The New Value Contribution will only be made if (a) the Court determines that the absolute priority rule applies to the Debtors' bankruptcy case, and (b) if the Debtors elect to make the contribution. The amount of the New Value Contribution is $250,000.

*Amended Disclosure Statement* at 15.

It is unclear whether the Debtors are proposing to contribute new value and reorganize, under Option D, or whether they are proposing to sell the El Camino Property within 12 months of the Effective Date of the Plan, under Option E.  From a disclosure

8

1  statement, creditors should be able to ascertain whether the Debtors intend to reorganize

2  or liquidate, and it is impossible to discern their intentions based on the Amended

3  Disclosure Statement.  Moreover, the Amended Disclosure Statement lacks adequate

4  information for creditors to make an informed judgment about the plan under § 1125(a)(1)

5  because as described in the Amended Disclosure Statement, the Plan sets forth five Plan

6  Options, but it does not state which Plan Option will be operative if the Plan is confirmed

7  and does not provide information on the court's subsequent rulings that affect the viability

8  of the various Options.  Therefore, the court finds that the Amended Disclosure

9  Statement does not contain adequate information under § 1125(a).

10          The court also determines that the Amended Disclosure Statement lacks adequate

11  information with respect to the Debtor's discretionary New Value Contribution of

12  $250,000.  By its definition in the Amended Disclosure Statement and Plan, the Debtors

13  state that the New Value Contribution will be made "at their election."  *Amended*

14  *Disclosure Statement* at 15.  The Amended Disclosure Statement and Plan do not

15  provide information to substantiate the Debtors' ability to make the New Value

16  Contribution.  The Amended Disclosure Statement lists bank accounts holding only

17  $38,000, and miscellaneous personal property worth approximately $45,000, as well as

18  real property assets of unknown value with no information about whether the Debtors

19  have any equity in these real property assets.  *Id.* at 21.  There is no information in the

20  Plan or Amended Disclosure Statement to support the possibility of a New Value

21  Contribution and the feasibility of the Plan, and therefore, the Amended Disclosure

22  Statement does not contain adequate information for creditors to make an informed

23  judgment about the plan under § 1125(a).

24          Finally, the Amended Disclosure Statement does not contain adequate information

25  with respect to the total amount owed to General Unsecured Creditors.  The Amended

26  Disclosure Statement lists total General Unsecured Claims as $1,128,383.86.  *Id.* at 32,

27  49.  The Debtors' objection to the Disputed U.S. Bank Claim, listed in the Amended

28  Disclosure Statement in the amount of $3,023,783.38, was overruled by a now final order

9

1  of the court. *Id.* at 13.  The Amended Disclosure Statement must be amended to include

2  U.S. Bank's allowed unsecured claim and to reflect an accurate amount owing to General

3  Unsecured Creditors.

4        Thus, for the reasons stated above, the court holds that the Amended Disclosure

5  Statement does not contain adequate information for creditors to make an informed

6  judgment about the plan as defined by § 1125, and approval of the Amended Disclosure

7  Statement must be denied.

8  **II.    The Plan is Patently Unconfirmable**

9        "[W]here a plan is on its face nonconfirmable, as a matter of law, it is appropriate

10  for the court to deny approval of the disclosure statement describing the nonconfirmable

11  plan." *In re Silberkraus*, 253 B.R. 890, 899 (Bankr. C.D. Cal. 2000); *see also* 7 Alan N.

12  Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 1125.03[4] at 1125-23 (16th ed.

13  2011) ("most courts will not approve a disclosure statement if the underlying plan is

14  clearly unconfirmable on its face") (citations omitted).  As one court described this

15  obligation in strong terms, "If, on the face of the plan, the plan could not be confirmed,

16  then the Court will not subject the estate to the expense of soliciting votes and seeking

17  confirmation." *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986).  "Not only would

18  allowing a nonconfirmable plan to accompany a disclosure statement, and be

19  summarized therein, constitute inadequate information, it would be misleading and it

20  would be a needless expense to the estate." *Id.*

21        Based on the moving and opposing papers, it is evident that Class 5 will reject the

22  Plan, and the Debtors will attempt to cram down pursuant to Section 1129(b) of the

23  Bankruptcy Code, 11 U.S.C.  As discussed below, because the court concludes that that

24  absolute priority rule applies in this case and that the Plan violates the absolute priority

25  rule, it is therefore appropriate to deny approval of the Amended Disclosure Statement on

26  this basis as well.

27

28

## A.    The Debtors Must Resort to Cramdown

The Amended Disclosure Statement lists total General Unsecured Claims as $1,128,383.86.  U.S. Bank's $3,023,783.38 claim, to which the Debtors objected, was not included in this figure as shown by the Amended Disclosure Statement and Plan.  As explained above, the court entered an order overruling the Debtors' objection.  U.S. Bank, therefore, holds an allowed unsecured deficiency claim, and that amount must be added to the General Unsecured Clams listed by the Debtors.  Thus, based on the figures included in the Amended Disclosure Statement, it is clear that U.S. Bank holds more than one-third of the outstanding General Unsecured Claims.

As discussed above, Class 5 is scheduled to receive distributions based on certain Options described in the Plan, and the only relevant Options are Option D and Option E. Under Option D creditors will receive a *pro rata* share of a promissory note created under the Plan ("Unsecured Creditor Note") with a stated principal amount of $600,000 plus interest at the federal judgment rate, providing for less than 15% of outstanding General Unsecured Claims.  Under Option E, the Debtors will "within 12 months of the Effective Date, close escrow on the sale of the [remaining property] and pay 100% of the Net Sale Proceeds to unsecured creditors who hold Allowed Claims."

A claim is impaired unless a plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."  11 U.S.C. § 1124(1).  Under either of the Options listed above, Class 5 is impaired.  Therefore, the Debtors must either obtain consent from Class 5 pursuant to 11 U.S.C. § 1129(a)(8), or the Debtors must cram down pursuant to § 1129(b).

Class 5 can only consent if creditors "that hold at least two-thirds in amount and more than one-half in number of the allowed claims" vote to accept the Plan.  11 U.S.C. § 1126.  Because U.S. Bank holds more than one-third of the allowed claims in Class 5, and because U.S. Bank has voiced its intention to vote against the proposed Plan in the opposing papers, it is clear that Class 5 will reject the proposed Plan.  The Debtors must

1  therefore resort to the cramdown provisions of § 1129(b) because there would be a

2  dissenting class of creditors, which does not satisfy the requirement of § 1129(a)(8).

3  **B.    The Absolute Priority Rule Applies**

4        In addressing whether the absolute priority rule applies in Chapter 11 bankruptcy

5  cases of individual debtors after BAPCPA, the courts are sharply divided.   The courts

6  that hold that the rule does not apply based on the so-called "broad" view of property of

7  the estate that an individual debtor may retain under a confirmed plan pursuant to 11

8  U.S.C. § 1129(b)(2)(B)(ii) include:  *In re Tegeder,* 369 B.R. 477, 479-481 (Bankr. D. Neb.

9  2007); *In re Roedemeier,* 374 B.R. 264, 273-276 & nn.15-19 (Bankr. D. Kan. 2007); *In re*

10 *Shat,* 424 B.R. 854, 862-868 (Bankr. D. Nev. 2010); *SPCP Group, LLC v. Biggins,* 465

11 B.R. 316, 320-324 (M.D. Fla. 2011); *Friedman v. P+P, LLC (In re Friedman),* 466 B.R.

12 471 (9th Cir. BAP 2012); *see also In re Johnson,* 402 B.R. 851, 852-853 (Bankr. N.D. Ind.

13 2009) (dicta that individual Chapter 11 debtor's plan need not satisfy the absolute priority

14 rule of 11 U.S.C. § 1129(b)(2)(B)(ii)); *In re Hockenberry,* 457 B.R. 646, 660-661 & n.14

15 (Bankr. S.D. Ohio 2011) (collecting cases on issue, but not reaching the issue because

16 case decided on other grounds).  The courts that hold that the absolute priority rule still

17 applies, adhering to the so-called "narrow" view of property of the estate that an individual

18 debtor may retain in a Chapter 11 plan, include: *In re Gbadebo,* 431 B.R. 222, 227-230

19 (Bankr. N.D. Cal. 2010); *In re Mullins,* 435 B.R. 352, 359-361 (Bankr. W.D. Va. 2010); *In*

20 *re Gelin,* 437 B.R. 435, 440-443 (Bankr. M.D. Fla. 2010; *In re Stephens,* 445 B.R. 816,

21 820-821 (Bankr. S.D. Tex. 2011); *In re Walsh,* 447 B.R. 45, 47-49 (Bankr. D. Mass.

22 2011); *In re Maharaj,* 449 B.R. 484, 491-494 (Bankr. E.D. Va. 2011); *In re Draiman,* 450

23 B.R. 777, 820-822 (Bankr. N.D. Ill. 2011); *In re Kamell,* 451 B.R. 505, 507-512 (Bankr.

24 C.D. Cal. 2011); *In re Lindsey,* 453 B.R. 886, 891-905 (Bankr. E.D. Tenn. 2011); *In re*

25 *Karlovich,* 456 B.R. 677, 679-682 (Bankr. S.D. Cal. 2010); *In re Lively,* ___ B.R. ___,

26 2012 WL 959286 (Bankr. S.D. Tex. 2012); *see also In re Friedman,* 466 B.R. at 484-492

27 (Jury, J., dissenting).  The court will discuss several points that it considers most

28 compelling in reaching its decision that the absolute priority rule applies in this case.

1    Before the court begins its analysis of this issue, however, the court will address the

2    impact of the recent decision in *Friedman* issued by the Ninth Circuit BAP.

3                    **i.    *Friedman* is Not Binding**

4            In this circuit, orders of the bankruptcy courts may be appealed to either the

5    federal district court or the BAP.  28 U.S.C. § 158(a), (b)(1), (c)(1); *see also Bank of Maui*

6    *v. Estate Analysis, Inc.,* 904 F.2d 470, 471 (9th Cir. 1990).  The authoritative effect of a

7    BAP decision remains an open question in this circuit.  *Bank of Maui,* 904 F.2d at 472;

8    *see also Zimmer v. PSB Lending Corp. (In re Zimmer),* 313 F.3d 1220, 1225-1226 (9th

9    Cir. 2002).  In *Bank of Maui,* the Ninth Circuit expressly declined to reach the issue, but it

10   held that the binding effect of a BAP decision was so uncertain that it cannot be the basis

11   for sanctioning a party under Rule 9011 of the Federal Rules of Bankruptcy Procedure.

12   *Bank of Maui*, 904 F.2d at 471.  The Ninth Circuit also concluded that a decision of the

13   BAP as an Article I court is not binding on the federal district courts that must be free to

14   formulate their own rules within their jurisdiction.  *Id.*  In a concurring opinion in *Bank of*

15   *Maui*, Judge O'Scannlain observed that the BAP was established by the Judicial Council

16   of the Ninth Circuit pursuant to 28 U.S.C. § 158 and that the order of the Judicial Council

17   provided that the BAP may hear and determine appeals from all districts within the circuit

18   that have authorized the use of the BAP pursuant to 28 U.S.C. § 158(b)(2).  *Id.* at 472

19   (O'Scannlain, J., concurring).  Judge O'Scannlain further noted that the Judicial Council

20   order outlined the BAP's powers and functions, but it did not describe the binding effect of

21   a BAP decision.  *Id.*  Judge O'Scannlain commented that the Judicial Council should

22   amend its order to provide that BAP decisions were binding on the bankruptcy courts in

23   the circuit.  *Id.*

24           As recently observed by the court in *In re Grant,* 423 B.R. 320 (Bankr. S.D. Cal.

25   2010), the Judicial Council of the Ninth Circuit has not amended the BAP authorization

26   order to provide that BAP decisions are binding on the bankruptcy courts within the circuit

27   as Judge O'Scannlain suggested.  *In re Grant,* 423 B.R. at 321, *citing In re Zimmer,* 313

28   F.3d 1220 at 1225-1226 (9th Cir. 2002).  In *Zimmer,* a panel of the Ninth Circuit stated in

                                              13

1  dicta that the binding nature of BAP decision was "an open question in this circuit" and

2  joined Judge O'Scannlain's call in *Bank of Maui* that the Judicial Council clarify whether

3  the bankruptcy courts must follow the BAP.    *In re Zimmer,* 313 F.3d at 1225.

4       The bankruptcy courts of the circuit are divided as to whether BAP decisions are

5  binding on them, and even within this judicial district, the bankruptcy courts are divided

6  on the issue.  *Compare In re Windmill Farms, Inc.*, 70 B.R. 618 (9th Cir. BAP 1987), *rev'd*

7  *on other grounds,* 841 F.2d 1467 (9th Cir. 1988) (BAP decisions are binding on

8  bankruptcy courts in the circuit), *Life Insurance Co. of Virginia v. Barakat (In re Barakat),*

9  173 B.R. 672 (Bankr. C.D. Cal. 1994) (same), *Coyne v. Westinghouse Credit Corp. (In re*

10  *Globe Illumination Co.*), 149 B.R. 614 (Bankr. C.D. Cal. 1993) (same) *with Rinard v.*

11  *Positive Investments, Inc. (In re Rinard),* 451 B.R. 12 (Bankr. C.D. Cal. 2011) (BAP

12  decisions not binding), *Crain v. PSB Lending Corp. (In re Crain),* 243 B.R. 75 (Bankr.

13  C.D. Cal. 1999) (same); *see also* Daniel J. Bussel, *Power, Authority and Precedent in*

14  *Interpreting the Bankruptcy Code,* 41 UCLA L. Rev. 1064 (1994).

15       Some bankruptcy courts, including the BAP itself, conclude that BAP decisions are

16  binding on the bankruptcy courts of the circuit.  *See*, *e.g.*, *In re Windmill Farms, Inc.*, 70

17  B.R. at 621; *In re Barakat,* 173 B.R. at 676-678; *In re Globe Illumination Co.*, 149 B.R. at

18  617-622.  In *Windmill Farms*, the BAP stated that "the BAP was [designed] to provide a

19  uniform and consistent body of bankruptcy law throughout the entire Circuit" and its

20  decisions must be binding "[i]n order to achieve this desired uniformity."  *In re Windmill*

21  *Farms*, 70 B.R. at 622.  As concluded by the courts in *Barakat* and *Globe Illumination*,

22  BAP decisions should be binding on the bankruptcy courts in the circuit under the

23  principles of *stare decisis.  In re Barakat*, 173 B.R. at 676 (recognizing the "need to have

24  a starting point from which legal analysis could begin and a way to avoid the repeated

25  litigation of identical issues in different cases"); *In re Globe Illumination Co.,* 149 B.R. at

26  617 ("Courts are bound by the decisions of law by higher courts under the principle of

27  *stare decisis.*")

28

Citing *Bank of Maui,* other bankruptcy courts conclude that BAP decisions do not carry the weight of *stare decisis* and thus, are not binding on them.  *See, e.g., In re Rinard,* 451 B.R. at 20 ("The decisions of the BAP are binding only on the judges whose orders have been reversed or remanded by the BAP in that particular dispute. In all other instances, the decisions of the BAP are effective only to the extent they are persuasive."); *In re Crain,* 243 B.R. at 81 & n.6.  In *Crain,* the court observed, "The bankruptcy courts that have concluded that BAP decisions are not binding do so because the doctrine of *stare decisis* is a judge created doctrine meant to function within a single track appellate system, where decisions are binding on courts on the same level or below."   243 B.R. at 81 n.6.  "The problem is that bankruptcy judges operate in a dual track system where decisions by BAP judges are not binding on district court judges and decisions by district court judges are not binding on BAP judges."  *Id.*  "An additional complexity is that the decision of one district court judge is not binding on his or her colleague."  *Id., citing Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415 (1996).

If an appeal is taken of this court's decision, which does not follow the BAP's holding in *Friedman*, to the BAP, most likely the BAP would reverse this court's decision in accordance with its policy stated in *Windmill Farms* that its decisions are binding on the bankruptcy courts of the circuit.  However, if an appeal is taken and a party alternatively elects to have the district court hear the appeal, the BAP's decision in *Friedman* would not be binding on the district court under *Bank of Maui.*  This situation presents a quandary for the court.  In exercising its duty of independent inquiry to examine the law, the court could decide to be bound by BAP decisions under the principle of *stare decisis,* but then again, other bankruptcy courts not only in the circuit, but in this judicial district, have come to a different conclusion, equally principled, in exercising this same duty of independent judicial inquiry in the absence of definitive authority that BAP precedent is

1  binding on them.[4]  Accordingly, in the absence of definitive guidance on the binding effect

2  of BAP decisions from the Judicial Council of the Ninth Circuit in an amended order on

3  BAP authority or by the Ninth Circuit itself in a precedential opinion, or other higher

4  authority (i.e., the Supreme Court or Congress), and in light of the lack of uniformity in

5  opinion on this issue among the bankruptcy courts in the circuit, the court adopts the

6  analysis in *Crain* and will thus consider, but will not be bound by, the decision of the BAP

7  in *Friedman* on the issue of whether the absolute priority rule applies in Chapter 11

8  bankruptcy cases of individual debtors.  *See In re Crain,* 243 B.R. at 81 & n.6.

9      As discussed below, the court concludes that the "broad" interpretation of § 1115

10  espoused by the majority BAP opinion in *Friedman* is not persuasive.  One reason is the

11  significant statement at the beginning of the opinion that "[n]o party has participated as an

12  appellee in this appeal," or in other words, the BAP reached its decision in *Friedman*

13  without the benefit of briefing from both sides.  *In re Friedman,* 466 B.R. at 473.

14  Furthermore, the court does not agree with the BAP in *Friedman* that the broad

15  interpretation of § 1115 is dictated by a plain reading of the statutory language.  The court

16  concludes that the language of § 1115 is ambiguous and that the broad interpretation is

17  strained and ultimately unpersuasive.  The court also concludes that the broad

18  _____

19  [4] In a law review article on the writing of judicial opinions, specifically on writing separately,
Judge (now Justice) Ruth Bader Ginsburg wrote:  "Disclosure of votes and opinion writers may
20  nourish a judge's ego, his or her sense of individuality; but if our system affords the judge
personal satisfaction, it also serves to hold the individual judge accountable.  The process of
21  writing signed opinions is a testing venture.  California's once Chief Justice Roger Traynor wrote
of the process: 'I have not found a better test for the solution of a case than its articulation in
22  writing, which is thinking at its hardest.  A judge . . . often discovers that his tentative views will
not jell in the writing.  He wrestles with the devil more than once to set forth a sound opinion that
23  will be sufficient unto more than the day.'  The prospect of a dissent or separate concurring
statement pointing out an opinion's inaccuracies and inadequacies strengthens the best; it
24  heightens the opinion writer's incentive to 'get it right.'"  Ruth Bader Ginsburg, *Remarks on
Writing Separately,* 65 Wash. L. Rev.  133, 139 (1990), *quoting* Roger J. Traynor, *Some Open
25  Questions on the Work of State Appellate Courts,* 24 U. Chi. L. Rev. 211, 218 (1957).  This
opinion is this court's effort to "get it right."  While this court may be critical of the opinions of other
26  courts, hopefully in an appropriate tone and manner, in pointing out what it perceives to be
inaccuracies and inadequacies, this court respects and admires the sincere efforts of those other
27  courts to "get it right" and to be as transparent and accountable as possible in articulating in
writing the reasons for their decisions.
28

1    interpretation is not supported by the weight of the case law as an emerging majority of

2    the courts deciding the issue have opted for the "narrow" interpretation of § 1115.  *In re*

3    *Lively,* __B.R. ___, 2012 WL 959286, at *2 (Bankr. S.D. Tex., Memorandum Opinion in

4    Support of Certification for Direct Appeal, filed on Mar. 21, 2012) (collecting cases).

5    Finally, the court finds that the legislative history and strong policy considerations require

6    a narrow reading of § 1115.

7                    **ii.        The Absolute Priority Rule**

8                    Chapter 11 of the Bankruptcy Code, 11 U.S.C., is the reorganization chapter of the

9    Code and sets forth a statutory system for reorganizing businesses in the United States.

10   11 U.S.C. § 1101 *et seq.; see also* Elizabeth Warren*, Chapter 11: Reorganizing*

11   *American Businesses* at 1-21 (2008); Elizabeth Warren & Jay Westbrook, *Success of*

12   *Chapter 11: A Challenge to the Critics*, 107 Mich. L. Rev. 603 (2009); Douglas G. Baird,

13   *The Elements of Bankruptcy* at 4-33, 66-86, 225-282 (4th ed. 2006).  Technically

14   speaking, reorganization refers to a change in the debt obligations of the business, but in

15   essence, it is a process that is "about how to spread around pain for a business that

16   cannot repay its debts in full."   Warren, *Chapter 11: Reorganizing American Businesses*

17   at 4.  In describing the purpose of Chapter 11, the Supreme Court has observed:

18              In proceedings under the reorganization provisions of the Bankruptcy
               Code, a troubled enterprise may be restructured to enable it to operate
19              successfully in the future. . . . By permitting reorganization, Congress
               anticipated that the business would continue to provide jobs, to satisfy
20              creditors' claims, and to produce a return for its owners. . . . Congress
               presumed that the assets of the debtor would be more valuable if used in
21              a rehabilitated business than if "sold for scrap."

22   *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 203 (1983), *citing* H.R. Rep. No. 95-

23   595, p. 220 (1977), *reprinted in* 1987 U.S. Code Cong. & Adm. News 5787, 6179; *see*

24   *also In re American Mariner Industries, Inc.,* 734 F.2d 426, 431 (9th Cir. 1984), *citing* H.R.

25   Rep. 95-595 at 220.  "Chapter 11 strikes a balance between a debtor's interest in

26   reorganizing and restructuring its debts and the creditors' interest in maximizing the value

27   of the bankruptcy estate."  *Florida Department of Revenue v. Piccadilly Cafeterias, Inc.,*

28   554 U.S. 33, 51(2008), *citing Toibb v. Radloff,* 501 U.S. 157, 163 (1991).   This balance

furthers "Chapter 11's twin objectives of preserving going concerns and maximizing

property available to satisfy creditors." *Id.* at 50, *quoting Bank of America National Trust*

*& Savings Assn. v. 203 North LaSalle Street Partnership,* 526 U.S. 434, 453 (1999)

(internal quotation marks omitted).

Most Chapter 11 cases are filed by entities, not individuals, but individual persons

may file a Chapter 11 case.  Warren, *Chapter 11: Reorganizing American Businesses* at

4.  ("About 90 percent of the Chapter 11 filers are legal fictions, mostly corporations, with

a few LLCs and partnerships thrown in.") (footnote omitted); *see also Toibb v. Radloff,*

501 U.S. at 160-161 (recognizing that individual debtors may file Chapter 11); John D.

Ayer & Michael L. Bernstein, *Bankruptcy in Practice* 96 (4th ed. 2007).  In explaining why

historically there have not been so many individual Chapter 11 cases, Ayer and Bernstein

comment:

> There has never been any great rush on the part of individuals to get into
> chapter 11.  For the most part, the individual cases in chapter 11 are
> limited to those with complex personal investments.  In the late 1980s
> and early 1990s, there were a fair number of real estate developer cases.
> We may see that again during the next real estate cycle.

Ayer & Bernstein, *Bankruptcy in Practice* at 96.

"The front door to Chapter 11 is wide—there are few restrictions to filing.  But the

back door is narrow—only about a third of all businesses that file for Chapter 11 manage

to emerge with a confirmed plan of reorganization."  Warren, *Chapter 11: Reorganizing*

*American Businesses* at 133.  The heart of the Chapter 11 process is creditor consent.

Elizabeth Warren & Jay Westbrook*, The Law of Debtors and Creditors* 677 (6th ed.

2009).  "A Chapter 11 petition is an invitation to a negotiation [between the debtor and the

creditors]."  *Id.* at 397.  "The law and practice of Chapter 11 establishes a framework for

negotiations."  Baird, *The Elements of Bankruptcy* at 86.   "For the businesses that make

it to the plan-confirmation process, the overwhelming majority of those that confirm a plan

do so with the consent of their creditors."  Warren, *Chapter 11: Reorganizing American*

*Businesses* at 133.  "If all the creditors consent, there are few restrictions on the shape

that the plan may take."  *Id.*  "The Code provides for confirmation over the objections of

1    the creditors in limited circumstances; however, few debtors actually litigate and

2    successfully confirm a plan over the vigorous opposition of their creditors." *Id.* at 133-

3    134.  Thus, "[t]he provisions for plan confirmation are central to the Chapter 11 process."

4    *Id.* at 134.  "Confirmation is the final settlement of the rights of the parties." *Id.*

5         In order for a plan to be confirmed consensually under 11 U.S.C. § 1129(a), it

6    must meet sixteen requirements set forth in § 1129(a)(1) through (16), including the

7    voting requirements of § 1129(a)(8).  11 U.S.C. § 1129(a)(1)-(16); *see also Bonner Mall*

8    *Partnership v. U.S. Bancorp Mortgage Co. (In re Bonner Mall Partnership),* 2 F.3d 899,

9    905 (9th Cir. 1993).  The voting requirements of § 1129(a)(8) mandate that "[w]ith respect

10   to each class of claims or interests---(A) such class has accepted the plan; or (B) such

11   class is not impaired under the plan."  11 U.S.C. § 1129(a)(8);  *In re Bonner Mall*

12   *Partnership,* 2 F.3d at 905.  "A class is deemed to have accepted a plan if at least two-

13   thirds in amount and more than one-half in number of claims in the class vote to accept

14   it."  *In re Bonner Mall Partnership,* 2 F.3d at 905 n.17; 11 U.S.C. § 1126(c).  "A class is

15   impaired if the plan does not provide it with full payment *in cash* of its claims on the date

16   the plan becomes effective."  *In re Bonner Mall Partnership,* 2 F.3d at 905 n.17; 11

17   U.S.C. § 1124(3)(A).

18        The Bankruptcy Code, however, "provides that where all requirements for

19   confirmation but section 1129(a)(8) are met, the bankruptcy court *shall* confirm a Chapter

20   11 reorganization plan over the objection of an impaired class or classes 'if the plan does

21   not discriminate unfairly, and is *fair and equitable,* with respect to each class of claims or

22   interests that is impaired under, and has not accepted, the plan.'"  *In re Bonner Mall*

23   *Partnership,* 2 F.3d at 906, *citing* 11 U.S.C. § 1129(b)(1)(emphasis in original).  "This

24   form of confirmation is commonly known in bankruptcy parlance as a 'cramdown'

25   because the plan is crammed down the throats of the objecting class(es) of creditors." *Id.*

26   Whether a cramdown plan is "fair and equitable" depends on whether it meets the

27   absolute priority test of  § 1129(b)(2)(B)(ii).  *Everett v. Perez (In re Perez),* 30 F.3d 1209,

28

1    1214 (9th Cir. 1994) (pre-BAPCPA case); *In re Bonner Mall Partnership,* 2 F.3d at 906

2    (same).

3        In describing the Chapter 11 cramdown plan, Professor Warren commented:

4    The cramdown plan . . . incorporates all of the requirements of the
     consensual plan—and all its normative values—except that the plan can
5    be confirmed even if some classes vote against it.  By permitting
     confirmation without the consent of all classes, the Code necessarily
6    realigns the power of participants in the bankruptcy process.  Cramdowns
     diminish the power of creditors, particularly their power to hold out for
7    better treatment than the minimum amounts guaranteed elsewhere in the
     Code.  The availability of the cramdown option also increases the number
8    of bankrupt businesses that are reorganized rather than liquidated,
     demonstrating once again a preference in the Code for reorganization.
9

10   Warren, *Chapter 11: Reorganizing American Businesses* at 168.  As further observed by

11   Professor Warren, the absolute priority rule is an important limitation on cramdown plans:

12   The absolute priority rule restricts the DIP's [debtor-in-possession's] use
     of the cramdown by requiring that equity holders retain no ownership in
13   the reorganizing business unless superior classes either have accepted
     the plan or received payment in full.  This fine-tunes the balance of power
14   among the parties.  If the DIP wants to confirm a plan that includes
     retaining equity ownership, it will either have to pay the creditors in full or
15   negotiate for their cooperation.  If, however, the DIP wants to sell the
     business and distribute the assets to creditors, a dissenting class cannot
16   block that action unless some other Code requirement has been violated.
     Thus, the power of creditors if they choose to dissent is restricted; they
17   can block some actions but not others.  The balance achieved is one that
     is designed to enhance reorganization, but to provide some creditor
18   protection as well.

19   *Id.*; *see also* Elizabeth Warren, *A Theory of Absolute Priority*, 1991 Annual Survey of

20   American Law 9 (1991).

21       In discussing cramdown and the absolute priority rule, Professors Warren and

22   Westbrook emphasize the importance of creditor consent:

23   There is a tendency . . . to focus on cramdown in Chapter 11 because it is
     a legal *rule*, and to ignore the negotiation that leads to creditor
24   acceptance of a plan because it is a messy, idiosyncratic *process*.  Yet
     negotiated consent is the essence of the Chapter 11 scheme . . . .  The
25   exclusive right to propose a plan and the possibility of a cramdown
     represent the leverage that the debtor brings to the negotiating table, but
26   agreement is the larger theme.  Chapter 11 is descended from both of the
     reorganization chapters, Chapters X and XI, under the old Act, but more
27   from the latter than the former.  Consent was the essence of Chapter XI
     . . . while absolute priority was the central focus of Chapter X . . . .  When
28   they were combined into Chapter 11, the absolute priority rule was

modified to permit equity participation if creditor consent was obtained.
Thus consent remains the heart of Chapter 11.

Warren & Westbrook, *The Law of Debtors and Creditors* at 669.

The absolute priority rule "provides that a dissenting class of unsecured creditors

must be provided for in full before any junior class can receive or retain any property

[under a reorganization] plan." *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 202

(1988) (citation omitted).  In *Ahlers,* the Supreme Court summarized the history and

development of the absolute priority rule:

> The rule had its genesis in judicial construction of the undefined
> requirement of the early bankruptcy statute that reorganization plans be
> "fair and equitable."  See *Northern Pacific R. Co. v. Boyd,* 228 U.S. 482,
> 504-505, 33 S.Ct. 554, 560, 57 L.Ed. 931 (1913); *Louisville Trust Co. v.
> Louisville, N.A. & C.R. Co.,* 174 U.S. 674, 684, 19 S.Ct. 827, 830, 43
> L.Ed. 1130 (1899).  The rule has since gained express statutory force,
> and was incorporated into Chapter 11 of the Bankruptcy Code adopted in
> 1978.  See 11 U.S.C. § 1129(b)(2)(B)(ii)(1982 ed., Supp. IV).  Under
> current law, no Chapter 11 reorganization plan can be confirmed over the
> creditors' legitimate objections (absent certain conditions not relevant
> here) if it fails to comply with the absolute priority rule.

485 U.S. at 202; *see also In re Kamell,* 451 B.R. at 509-510 ("The absolute priority rule

has been a mainstay of Chapter 11 and predecessor practice since at least the 1930s.  If

the railroad reorganization cases are also considered, the absolute priority rule or

something very like it has been acknowledged as far back as at least the 1890s.")

(citations omitted); Kenneth N. Klee, *Bankruptcy and the Supreme Court* 366-397 (2008)

(detailed discussion of Supreme Court precedent on absolute priority rule and its

antecedents since *Railroad Co. v. Howard,* 74 (7 Wall.) 392 (1869)).

The absolute priority rule is codified at 11 U.S.C. § 1129(b)(2)(B)(ii) and prohibits

"the bankruptcy court from approving a plan that gives the holder of a claim anything at

all unless all objecting classes senior to him have been paid in full."  *In re Perez,* 30 F.3d

at 1214.  Specifically, § 1129(b) in its current form allows debtors to confirm a plan over

the objection of unsecured creditors so long as the unsecured class is given "fair and

equitable" treatment under the plan through one of the two options under

§ 1129(b)(2)(B)(i) or (ii):

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
. . .

(B) With respect to a class of unsecured claims---

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

11 U.S.C. § 1129(b).  "In other words, a plan may not give 'property' to the holders of any junior claims or interests 'on account of' those claims or interests, unless all classes of senior claims either receive full value of their claims or give their consent."  *In re DBSD North America, Inc.,* 634 F.3d 79, 88 (2d Cir. 2011), *quoted in In re Lindsey,* 453 B.R. at 892.

In *Bank of America National Trust & Savings Assn. v. 203 North LaSalle Street Partnership,* the Supreme Court described the rationale for the absolute priority rule:

The Bankruptcy Act preceding the Code contained no such provision as subsection (b)(2)(B)(ii), its subject having been addressed by two interpretive rules. The first was a specific gloss on the requirement of § 77B (and its successor, Chapter X) of the old Act, that any reorganization plan be "fair and equitable." 11 U.S.C. § 205(e) (1934 ed., Supp. I) (repealed 1938) (§ 77B); 11 U.S.C. § 621(2) (1934 ed., Supp. IV) (repealed 1979) (Chapter X). The reason for such a limitation was the danger inherent in any reorganization plan proposed by a debtor, then and now, that the plan will simply turn out to be too good a deal for the debtor's owners. See H.R. Doc. No. 93–137, pt. I, p. 255 (1973) (discussing concern with "the ability of a few insiders, whether representatives of management or major creditors, to use the

22

reorganization process to gain an unfair advantage"); *ibid.* ("[I]t was believed that creditors, because of management's position of dominance, were not able to bargain effectively without a clear standard of fairness and judicial control"); Ayer, Rethinking Absolute Priority After *Ahlers,* 87 Mich. L.Rev. 963, 969–973 (1989). Hence the pre-Code judicial response known as the absolute priority rule, that fairness and equity required that "the creditors . . . be paid before the stockholders could retain [equity interests] for any purpose whatever." *Northern Pacific R. Co. v. Boyd,* 228 U.S. 482, 508, 33 S.Ct. 554, 57 L.Ed. 931 (1913). See also *Louisville Trust Co. v. Louisville, N.A. & C.R. Co.,* 174 U.S. 674, 684, 19 S.Ct. 827, 43 L.Ed. 1130 (1899) (reciting "the familiar rule that the stockholder's interest in the property is subordinate to the rights of creditors; first of secured and then of unsecured creditors," and concluding that "any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation").

526 U.S. at 444.   As this statement recounts, the absolute priority rule was judicially created before its legislative enactment in the Bankruptcy Code of 1978.  *Id.; see also* John D. Ayer, *Rethinking Absolute Priority after Ahlers,* 87 Mich. L. Rev. 963 (1989) (recounting the history and development of the absolute priority rule).  The reason for the absolute priority rule as recognized by Congress and observed by the Supreme Court in *203 North LaSalle Street Partnership* was "the danger inherent in any reorganization plan proposed by a debtor, then and now, that the plan will simply turn out to be too good a deal for the debtor's owners."   526 U.S. at 444-445, *citing* H.R. Doc. No. 93-137, pt. I, p.255 (1973); *see also In re Lindsey,* 453 B.R. at 892.  In her article entitled *A Theory of Absolute Priority*, Professor Warren elaborated on this concern:

> The legal rule of absolute priority had its genesis in the long-standing common law maxim that creditors would be paid ahead of equity.  This rule assured those who did business with the corporation that if the business were dissolved the creditors would be paid before the insiders would recover their investments.  In case of collapse, the creditors could count on payment in full before equity collected anything from the business assets.
>
> The provision is a form of creditor protection, one of many that attempt to restrict the ability of corporate owners and insiders from depleting a failing business for their own benefit, leaving the creditors with only the empty shell of a business.  In part, the rule is designed to offset some of the consequences of superior information and control necessarily available to equity owners when they manage the business or exercise close supervision over the nominal managers.  The rules of absolute priority satisfy concerns similar to those of state law rules of dividend distribution, for example, which require that the corporation only distribute stock

1
2
3
4

> dividends from earned surplus rather than from the general assets of the business.  As any good law-and-economics devotee could point out, creditors could have insisted on such provisions in advance, but the law provides an off-the-rack ordering among the parties that is nearest to what the parties would likely have negotiated for themselves, requiring that the owners/insiders restrict their abilities to take assets from the business to the injury of the creditors.

5  Warren, *A Theory of Absolute Priority* at 37-38.

6  As described by Professor Baird, the centrality of the absolute priority rule drives

7  the Chapter 11 process:

8
9
10
11
12
13
14
15
16

> The ambition of every lawyer whose client files a Chapter 11 petition is to persuade each group of creditors to consent to a plan of reorganization. Whether a group consents depends on its rights under the plan versus the rights it would have if it refused to go along with the plan.  The absolute priority rule is central to the law of corporate reorganizations because it is the source of substantive rights as well as the procedural protections that each participant in a reorganization enjoys.  Parties can insist that the priority rights they enjoyed outside of bankruptcy be respected inside.  Nevertheless, every junior party, including the shareholders, can invoke elaborate procedures before their rights are compromised.  The absolute priority rule allows the senior parties to insist on full payment, but it also grants all junior parties those procedural protections necessary for a "just reorganization."  Resolving this tension between substantive and procedural rights that began with [*Northern Pacific R. Co. v.*] *Boyd*[.174 U.S. 482 (1913)] remains central to answering the hard questions that arise under Chapter 11.

17  Baird, *The Elements of Bankruptcy* at 86.

18  Thus, the court considers the hard question of whether Congress in enacting

19  BAPCPA abrogated the absolute priority for Chapter 11 bankruptcy cases of individual

20  debtors in adding new § 1115 to, and amending § 1129(b)(2)(B)(ii) of, the Bankruptcy

21  Code, 11 U.S.C.

22  **iii.   Reconciliation of § 1129(b)(2)(B) and § 1115**

23  The absolute priority rule was amended by BAPCPA to provide for an exception in

24  the Chapter 11 case of an individual debtor.  11 U.S.C. § 1129(b)(2)(B)(ii).  Specifically,

25  Section 321(c) of BAPCPA added the following statutory language, which so amended

26  the absolute priority rule: "except that in a case in which the debtor is an individual, the

27  debtor may retain property included in the estate under section 1115, subject to the

28

1  requirements of subsection (a)(14) of this section."[5]  *Id.*   The critical question of statutory

2  interpretation is what does the phrase "property included in the estate under section

3  1115" mean, which allows an individual debtor to retain certain property in a confirmed

4  Chapter 11 reorganization plan as an exception to the absolute priority rule.  *In re*

5  *Lindsey,* 453 B.R. at 891-892.  In order to answer this question, § 1115, added by

6  BAPCPA, must be examined, and this statutory provision states:

7       (a) In a case in which the debtor is an individual, property of the estate
         includes, in addition to the property specified in section 541—

8

9            (1) all property of the kind specified in section 541 that the debtor
             acquires after the commencement of the case but before the case

10           is closed, dismissed, or converted to a case under chapter 7, 12, or
             13, whichever occurs first; and

11           (2) earnings from services performed by the debtor after the
             commencement of the case but before the case is closed,

12           dismissed, or converted to a case under chapter 7, 12, or 13,
             whichever occurs first.

13

14  11 U.S.C. § 1115(a).

15       How the court interprets amended § 1129(b)(2)(B)(ii) and new § 1115(a) will

16  ultimately affect the balance of power between the parties in this Chapter 11 bankruptcy

17  case of individual debtors.  "The Bankruptcy Code establishes a rough allocation of

18  power among the parties in interest in a bankruptcy case, and the courts refine that

19  allocation with their interpretation of the statutory provisions."   Warren, *Chapter 11:*

20  *Reorganizing American Businesses* at 168-169.  The specific problem is whether § 1115

21  should be construed broadly or narrowly in order to determine what property an individual

22  debtor may retain under a confirmed Chapter 11 plan (i.e., "property included in the

23  estate under section 1115") pursuant to 11 U.S.C. § 1129(b)(2)(B)(ii). *In re Lindsey,* 453

24  B.R. at 891-893.  One court has succinctly framed the precise issue as follows:

25

26       [5] 11 U.S.C. § 1129(a)(14) states: "If the debtor is required by a judicial or administrative order,
    or by statute, to pay a domestic support obligation, the debtor has paid all amounts payable under

27  such order or such statute for such obligation that first become payable after the date of the filing
    of the petition.

28

1
2
3
4
5
6
7
8

> This new provision [i.e., Section 1115] both refers to the property already
> brought into the bankruptcy estate by § 541 and brings more property into
> the estate.  Unfortunately, the exception and § 1115(a) are worded in
> such a way that the exception could be construed narrowly to cover only
> the additional, post-petition property brought into the Chapter 11
> bankruptcy case by § 1115(a), or broadly to cover not only that property
> but also all of the property brought into the estate by § 541, most of which
> is property the debtor had before filing for bankruptcy.  The first
> construction would greatly limit the impact of the new exception under
> § 1129(b)(2)(B)(ii), but the second would exempt an individual Chapter 11
> debtor from the main facet of the absolute priority rule, allowing him or
> her to retain both pre- and postpetition property under a plan even though
> a class of unsecured creditors would not be paid in full.  The Court must
> determine which interpretation matches Congress's intent in making
> these changes.

9    *In re Roedemeier,* 374 B.R. at 274; *see also In re Karlovich,* 456 B.R. at 680-681.

10    The courts have disagreed on whether the meaning of the operative language of

11    § 1115 is plain or ambiguous.  Some courts have held that the plain language of the

12    statute supports the broad view.  *See In re Friedman*, 466 B.R. at 482; *SPCP Group, LLC*

13    *v. Biggins,* 465 B.R. at 320-323; *In re Tegeder,* 369 B.R. at 480.  Some courts have held

14    that the plain meaning rule supports the narrow view.  *See In re Karlovich*, 456 B.R. at

15    681; *In re Lively,* ___ B.R. ___, 2012 WL 959286, at *6.  Some courts have found that the

16    language of the statute is ambiguous and have held that statutory interpretation favors

17    the broad view.  *See In re Shat,* 424 B.R. at 867.  Other courts finding the statutory

18    language ambiguous have determined that statutory analysis supports the narrow view.

19    *See In re Gbadebo,* 431 B.R. at 229; *In re Mullins,* 435 B.R. at 360; *In re Gelin,* 437 B.R.

20    at 439-443; *In re Kamell,* 451 B.R. at 509; *In re Lindsey,* 453 B.R. at 903-905.

21    The court begins its analysis with the language of the statute.  *United States v.*

22    *Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241 (1989) ("The task of resolving the dispute

23    over the meaning of [a statute] begins where all such inquiries must begin: with the

24    language of the statute itself.") (citation omitted).  "[W]here . . . the statute's language is

25    plain, the sole function of the courts is to enforce it according to its terms."  *Id.* (citation

26    and internal quotation marks omitted).  "[C]ourts must presume that a legislature says in

27    a statute what it means and means in a statute what it says there."  *Connecticut National*

28    *Bank v. Germain,* 503 U.S. 249, 253-254 (1992), *quoted in In re Lindsey,* 453 B.R. at 893

1  (citations and internal quotation marks omitted).  "When the words of a statute are

2  unambiguous, then, this first canon is also the last: judicial inquiry is complete."  *Id.*

3  (citation and internal quotation marks omitted).  "Courts are to scrutinize the statute as a

4  whole and 'not look merely to a particular clause in which general words may be used,

5  but . . . in connection with the whole statute . . . and the objects and policy of the law, as

6  indicated by its various provisions, and give to it such a construction as will carry into

7  execution the will of the Legislature.'"  *In re Lindsey,* 453 B.R. at 893, *quoting Azarte v.*

8  *Ashcroft,* 394 F.3d 1278, 1288 (9th Cir. 2005), *quoting Kokoszka v. Belford,* 417 U.S.

9  642, 650 (1974) (citation omitted).  The Supreme Court in *Ron Pair* also stated that "as

10  long as the statutory scheme is coherent and consistent, there generally is no need for a

11  court to inquire beyond the plain language of the statute."  489 U.S. at 240-241.  "[T]he

12  plain language is regarded as conclusive, unless (1) the statutory language is unclear, (2)

13  the plain meaning of the words is at variance with the policy of the statute as a whole, or

14  (3) a clearly expressed legislative intent exists contrary to the language of the statute."

15  *Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc.,* 866 F.2d

16  278, 280 n.4 (9th Cir. 1989), *citing inter alia, Richards v. United States,* 369 U.S. 1, 11

17  (1962).

18        Furthermore, the Supreme Court has stated that "[i]t is 'a cardinal principle of

19  statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it

20  can be prevented, no clause, sentence, or word shall be superfluous, void, or

21  insignificant.'"  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citation omitted); *accord, In*

22  *re Friedman,* 466 B.R. at 487 (Jury, J., dissenting), *citing inter alia, Connecticut National*

23  *Bank v. Germain,* 503 U.S. at 253 ("[C]ourts should disfavor interpretations of statutes

24  that render language superfluous").   It is also "[a] fundamental canon of statutory

25  construction . . . that, unless otherwise defined, words will be interpreted as taking their

26  ordinary, contemporary, common meaning."  *In re Lindsey,* 453 B.R. at 893, *quoting*

27  *Perrin v. United States,* 444 U.S. 37, 42 (1979).

28

The court in *Roedemeier* precisely identified the interpretative problem raised by the statutes here: "Unfortunately, the exception and § 1115(a) are worded in such a way that the exception could be construed narrowly to cover only the additional, post-petition property brought into the Chapter 11 bankruptcy estate by § 1115(a), or broadly to cover not only that property but also all the property brought into the estate by § 541, most of which is property the debtor had before filing for bankruptcy." *In re Roedemeier,* 374 B.R. at 274.  Thus, the court agrees with the court in *Lindsey*, which concluded that "it is axiomatic that the language of § 1129(b)(2)(B)(ii) and § 1115 is ambiguous, otherwise there would be no split of authority and the arguments in favor of each position so diverse." *In re Lindsey*, 453 B.R. at 903.

The exception to the absolute priority rule added by Section 321(c) of BAPCPA excepts from the rule in the case of an individual Chapter 11 debtor, "property included in the estate under section 1115," which the debtor may retain in a confirmed plan under the cramdown standards of § 1129(b).  11 U.S.C. § 1129(b)(2)(B)(ii).  Thus, the exception refers to § 1115, which provides in pertinent part:

> (a) In a case in which the debtor is an individual, property of the estate includes, in addition to the property specified in section 541—
>
> > (1) all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first; and
> >
> > (2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first.

11 U.S.C. § 1115(a).

Prior cases have focused on analyzing the word "includes" in § 1115(a) and the word "included" in the phrase, "property of the estate included under section 1115" in the exception to the absolute priority rule under § 1129(b)(2)(B)(ii) to determine what property of the bankruptcy estate an individual debtor may retain in Chapter 11.  *In re Shat,* 424 B.R. at 862-868; *In re Gbadebo,* 431 B.R. at 228-229; *In re Kamell,* 451 B.R. at 509; *In re*

1  *Lindsey,* 453 B.R. at 893-905; *In re Friedman,* 466 B.R. at 482 (majority opinion), 466

2  B.R. at 487-489 (Jury, J., dissenting); *In re Lively,* ___B.R. ___, 2012 WL 959286, at *5.

3      Definitions of the words, "includes" and "included," are set forth in the American

4  Heritage Dictionary of the English Language, as follows:

5      Include *tr.v.* –cluded, -cluding, -cludes    1.  To take in as a part, element,
       or member.  2. To contain as a secondary or subordinate element.  3.  To
6      consider with or place into a group, class or total . . . .

7  *American Heritage Dictionary of the English Language* at 887 (4th ed. 2000).

8      For the reasons set forth in this memorandum decision, the structure of the

9  sentence in § 1115(a) containing the word "includes" presents a question of grammar

10  which needs to be analyzed and understood.  "To be a sentence, a group of words must

11  [h]ave a *subject* (noun or pronoun), [h]ave a *predicate* (verb or verb phrase) [and

12  e]xpress a *complete thought."*  Laurie Rozakis, *English Grammar for the Utterly Confused*

13  at 116 (2003) (italics in original). [6]  "A *sentence* has two parts: a *subject* and a *predicate.*

14  The *subject* includes the noun or pronoun that tells what the subject is about."  *Id.* (italics

15  in original).  "The *predicate* includes the verb that describes what the subject is doing."

16  *Id.* (italics in original).

17      In order to understand a subject and a predicate, parts of speech, i.e., noun or

18  pronoun, and verb, must be defined:  "A *noun* is a word that names a person, place, or

19  thing. . . .  A *pronoun* is a word used in place or a noun or another pronoun. . . . *Verbs*

20  name an action or describes a state of being."  *Id.* at 8-9, 12. (italics in original).  One

21  type of verb is an *action verb,* which "tell[s] what the subject does."  *Id.* at 12.  "An action

22  verb can be *transitive* or *transitive.  Transitive verbs* need a direct object. . . .  *Intransitive*

23  *verbs* do not need a direct object."  *Id.* (italics in original).   "A *direct object* is a noun or

24  pronoun that receives the action."  *Id.* at 21.

25

_____

26  [6] The author of this reference work, Laurie Rozakis, Ph.D, is professor of English at
Farmington State College, State University of New York, who has taught grammar and usage for
27  more than 25 years.  Rozakis, *English Grammar for the Utterly Confused* at back cover;
http://www.farmingdale.edu/academics/arts-sciences/english/faculty.shtml.

28

In interpreting § 1115(a), the court determines that it is necessary to analyze it from a grammatical perspective as a sentence, which reads as follows:

> In a case in which the debtor is an individual, property of the estate includes, in addition to the property specified in section 541—
>
> > (1) all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first; and
> >
> > (2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first.

11 U.S.C. § 1115(a).

The subject of the sentence, or the noun or pronoun that tells what the subject is about, is "property of the estate." Rozakis*, English Grammar for the Utterly Confused* at 116. "Property of the estate" is not a single-word noun; it is a collective noun, which is a noun that "name[s] groups of people or things," and which in this case is a group of assets constituting assets of the bankruptcy estate. 11 U.S.C. §§ 541 and 1115; *see also,* Rozakis*, English Grammar for the Utterly Confused* at 8. The predicate of the sentence includes the verb that describes what the subject is doing, which happens to be the transitive verb, "includes." 11 U.S.C § 1115(a); *American Heritage Dictionary of the English Language* at 887 (definition of "include" lists it as "*tr. v.,"* or transitive verb).

As stated previously, transitive verbs require a direct object or direct objects, and a direct object is a noun or pronoun that receives the action. The direct objects of the sentence, or the nouns that receive the action of the transitive verb, "includes," are:

> (1) all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first (i.e., all post petition property acquired by the debtor); and
>
> (2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first (i.e., all earnings from the debtor's postpetition services).

1   11 U.S.C. § 1115(a)(1) and (2).  All postpetition property of the debtor and all earnings

2   from the debtor's position services are collective nouns.  Thus, as to these two categories

3   of assets, the sentence expresses a complete thought:  The "property of the estate"

4   (subject) "includes" (transitive verb) all postpetition property of the debtor (direct

5   object/collective noun) and all earnings from the debtor's postpetition services (direct

6   object/collective noun).  11 U.S.C. § 1115(a)(1) and (2).  The predicate of the sentence

7   consists of the transitive verb, "includes," and the direct objects, "all postpetition property

8   of the debtor" and "all earnings from the debtor's postpetition services."  Based on its

9   review of the case law, the court concludes that the courts adopting the broad view of

10  § 1115(a) and those adopting the narrow view would agree with the complete thought of

11  this statutory sentence that these assets are "included" as "property of the estate

12  included under section 1115" for purposes of the exception to the absolute priority rule for

13  individual Chapter 11 debtors under § 1129(b)(2)(B)(ii).  11 U.S.C. § 1115(a)(1) and (2),

14  1129(b)(2)(B)(ii); *see In re Shat,* 424 B.R. at 863; *In re Gbadebo,* 431 B.R. at 229; *In re*

15  *Friedman,* 466 B.R. at 481 (majority opinion), 466 B.R. at 487-488 (Jury, J., dissenting).

16       Section 1115(a) refers to a third category of assets called "the property specified in

17  section 541," which raises the issue in the dispute in this case as to the broad versus

18  narrow view of the statute.  There should be no dispute that "the property specified in

19  section 541" is a collective noun.  However, the court notes differences in placement of

20  this collective noun in the statutory sentence.  First, it is not separately enumerated like

21  (1) and (2) for the other categories of assets.  Second, it is attached to the phrase, "in

22  addition to."

23       Because the original meaning of "includes" is "[t]o take in as a part, element or

24  member," separate enumeration of the items "included" helps to identify what parts,

25  elements or members are included.  That appears to be the reason why Congress

26  separately enumerated: (1) all postpetition property of the debtor; and (2) all earnings

27  from the debtor's postpetition services in § 1115(a).

28

31

1    The third category of assets, "the property specified in section 541," is treated

2    differently in § 1115(a) is prefaced and modified by the phrase, "in addition to," which

3    indicates that it is "besides," or "separate from," the subject of the sentence, i.e., "property

4    of the estate."  "The ordinary meaning of 'in addition to' is 'a part added' or 'besides.'"  *In*

5    *re Friedman*, 466 B.R. at 488 (Jury, J., dissenting), *citing Merriam–Webster's Dictionary*,

6    http://merriam-webster.com and *Oxford English Dictionary,* http://oxforddictionaries.com

7    ("the action or process of adding something to something else"); *see also Cohen v.*

8    *United States,* 121 F.2d 1007, 1008 (5th Cir. 1941) ("'In addition' means that an

9    additional but separate grace or privilege is to be extended.").  *The American Heritage*

10   *Dictionary of the English Language* defines "in addition to" in a similar manner, i.e., "Over

11   and above, besides."  *The American Heritage Dictionary of the English Language* at 20

12   (listed under definition of "addition").  The phrase, "the property specified in section 541,"

13   is not a direct object, or a noun or pronoun that receives the action of the transitive verb,

14   "includes" because another phrase, "in addition to," gets in the way and cannot be

15   ignored.  "A *phrase* is a group of words that functions in a sentence as a single part of

16   speech."  Rozakis, *English Grammar for the Utterly Confused* at 102.  "A phrase does not

17   have a subject or a verb, so it cannot stand alone as an independent unit---it can function

18   only as a part of speech."  *Id.*  Professor Rozakis further states on phrases:  "As you

19   write, you use phrases to add detail by describing.  Phrases help you express yourself

20   more clearly."  *Id.*

21   The phrase, "in addition to," is part of a prepositional phrase because it begins with

22   a preposition, "in."  Rozakis, *English Grammar for the Utterly Confused* at 9, 102-103.

23   "Prepositions link a noun or a pronoun following it to another word in the sentence."  *Id.* at

24   9.  The object of the prepositional phrase is "the property specified in section 541."  *Id.* at

25   102.  "A *prepositional phrase* is a group of words that begins with a preposition and ends

26   with a noun or pronoun.  This noun or pronoun is called the 'object of the preposition.'"

27   *Id.* (italics in original).  Thus, the entire prepositional phrase, which is relevant in

28   interpreting the meaning of § 1115(a), is "in addition to the property specified in section

541." 11 U.S.C. § 1115(a).  Since prepositions link a noun or pronoun to another word in

a sentence, the question before the court is this: to what word is the noun, "the property

specified in section 541" linked in § 1115(a), i.e., "property of the estate," another noun,

which reflects the broad view; or is it linked to "includes," a verb, which reflects the

narrow view.  11 U.S.C. § 1115(a).

In technical grammatical terms, the specific question is whether "in addition to

property specified in section 541" is an "adjectival phrase" or an "adverbial phrase."

Rozakis, *English Grammar for the Utterly Confused* at 102-103.  An "adjectival phrase" is

defined as follows:

> When a prepositional phrase serves as an adjective, it's called an
> *adjectival phrase*.  An adjectival phrase, as with an adjective, describes a
> noun or pronoun.  To find out if a prepositional phrase is functioning as an
> adjectival phrase, see if it answers these questions: "Which one?" or
> "What kind?"

*Id.* at 102 (italics in original).   An "adverbial phrase" is defined as follows:

> When a prepositional phrase serves as an adverb, it's called an *adverbial
> phrase.*  In these cases, it describes a verb, an adjective, or adverb.  To
> find out if a prepositional phrase is functioning as an adverbial phrase,
> see if it answers one of these questions: "Where?" "When?" "In what
> manner?" "To what extent?"

*Id.* at 103 (italics in original).

Applying this analysis, the prepositional phrase, "in addition to the property

specified in section 541" is an adverbial phrase because it modifies the verb, "includes,"

to explain to what extent "property of the estate" is included under § 1115(a), i.e.,

postpetition property and services under § 1115(a)(1) and (2).  The prepositional phrase,

"in addition to the property specified in section 541," is not an adjectival phrase because it

does not describe a noun ( i.e., "property of the estate") as it does not answer the

questions, "Which one?" or "What kind?"  To reach that result, the words, "in addition to"

must be ignored, which would not be the express language of the statute.  *TRW Inc. v.

Andrews*, 534 U.S. at 33.  In sum, this means that "in addition to the property specified in

section 541" is an adverbial prepositional phrase linked to the verb, "includes,"  because

it modifies the word, "includes," in answering the question "to what extent is property

included as property of the estate under § 1115(a)."  As part of the prepositional phrase, "in addition to the property specified in section 541," the phrase, "the property specified in section 541" cannot be viewed in isolation.  The phrase is part of the prepositional phrase beginning with "in addition to," and is thus not the direct object of the transitive verb, "includes," so it does not relate to the subject of the sentence, "property of the estate." In other words, from a functional standpoint, the phrase, "the property specified in section 541," is not an answer to the question what is included as "property of the estate" under § 1115.  Accordingly, the court concludes that based on the grammatical structure of § 1115, "the property specified in section 541" is not "property included in the estate under section 1115,"  which may be retained by an individual Chapter 11 debtor pursuant to the exception to the absolute priority rule in § 1129(b)(2)(B)(ii).  Although a grammatical analysis of the words, phrases and sentences in § 1115(a) is technical and somewhat formalistic, it is a helpful aid in interpreting the statutory language of § 1115(a) as recognized by a canon of statutory construction that "[w]ords are to be interpreted according to the proper grammatical effect of their arrangement within the statute."  2A Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction*, § 48A.8 at 768-769 & n.37 (7th ed. 2007 and 2011-2012 Supp.) (citations omitted); *see also Resolution Trust Corporation v. Love*, 36 F.3d 972, 976 (10th Cir. 1994) ("A statute must be construed as 'mandated by the grammatical structure.'"), *quoting United States v. Ron Pair Enterprises, Inc.*, 489 U.S. at 241.  As discussed in this section of the memorandum decision, a grammatical analysis of the statutory language of § 1115 supports a narrow interpretation of the statute, but as otherwise discussed in other sections of this memorandum decision, the grammatical analysis is *in addition to* other methods of statutory construction that also show the narrow view is correct.

Another point of grammar is that "[p]hrases or clauses introduced by such expressions as *together with, as well as, in addition to* are not part of the subject and, therefore, do not affect the number of the verb."  Margaret Shertzer, *The Elements of Grammar* at 23 (1986) (italics in original); *see also* William Strunk & E.B. White, *Elements*

*of Style* at 10 (3d ed. 1979).  This grammatical point reinforces the idea that "in addition

to" means that the matter is "besides" or "separate from" the subject of the sentence,

which in § 1115(a) means "property of the estate" included under § 1115.  *See* 11 U.S.C.

§ 1129(b)(2)(B)(ii).

The courts favoring the broad view of § 1115, *e.g., Friedman* and *Shat,* adopt that

view based on the premise that § 1115 subsumes and supplants § 541 in individual

Chapter 11 cases.  *In re Friedman,* 466 B.R. at 478-484; *In re Shat,* 424 B.R. at 865

("Section 1115 absorbs and then supersedes Section 541 for individual Chapter 11

cases.").  As stated in *Friedman*,

> We believe that § 1115 plainly identifies an individual Chapter 11 debtor's
> estate as
>
>> (1) Property specified in § 541 (i.e., "property of the estate includes,
>> *in addition to the property specified in section 541*") (emphasis
>> added);
>>
>> (2) All property of the kind specified in § 541 that the (individual)
>> debtor acquires after the commencement (but before the closure,
>> dismissal or conversion) of the case; and
>>
>> (3) [E]arnings from services performed by the debtor after the
>> commencement of the case but before the case is closed,
>> dismissed, or converted to a case under chapter 7, 12, or 13,
>> whichever occurs first.

*In re Friedman*, 466 B.R. at 481.  The problem this court has with this manner of

"identification" is that it reinterprets § 1115(a) by unduly ignoring or diminishing (1) the

effect of key phrase, "in addition to," and (2) the effect of § 541 by subsuming and

supplanting it into § 1115(a).  If Congress had intended for § 1115 to subsume or

supplant § 541, it could have added § 541 to the enumerated items on the list in

§ 1115(a).  Instead, § 1115(a) adds only two items: (1) all postpetition property of an

individual debtor and (2) earnings from postpetition services performed by the debtor.

Thus, as discussed in this memorandum decision, the court agrees with the courts

adopting the narrow view that § 1115 does not subsume or supplant § 541.  *In re Kamell*,

451 B.R. at 512, *In re Lindsey*, 453 B.R. at 904; *In re Karlovich*, 456 B.R. at 681; *In re*

*Gbadebo*, 431 B.R. at 230; *In re Friedman*, 466 B.R. at 492 (Jury, J., dissenting).

1    Section 541 is the provision of the Bankruptcy Code that defines and creates the

2   bankruptcy estate, and it applies to all chapters of the Code, including Chapter 11:

3       (a) The commencement of a case under section 301, 302, or 303 of this
            title creates an estate.  Such estate is comprised of all the following
4           property, wherever located and by whomever held:

5           (1) Except as provided in subsections (b) and (c)(2) of this section,
                all legal or equitable interests of the debtor in property as of the
6               commencement of the case. . . .

7   11 U.S.C. § 541(a)(1).[7]  "Section 103(a) provides that § 541 applies in a chapter 11

8   case, including an individual chapter 11 case."  *In re Gbadebo,* 431 B.R. at 229.

9        Section 541 not only creates the bankruptcy estate in a case under the Bankruptcy

10  Code, but it also defines what the estate is comprised of, which definition is very broad,

11  i.e., all prepetition legal or equitable interests of the debtor.  In describing the critical

12  importance of § 541, *Collier on Bankruptcy* states:

13      Section 541 embodies the essence of the Bankruptcy Code.  It creates
        the bankruptcy estate, which consists of all of the property that will be
14      subject to the jurisdiction of the bankruptcy court.  Property belonging to
        the estate is protected from piecemeal dismantling by creditors by the
15      automatic stay of section 362.  It is this central aggregation of property
        that promotes the fundamental purposes of the Bankruptcy Code: the
16      breathing room given to a debtor that attempts to make a fresh start, and
        the equality of distribution of assets among similarly situated creditors,
17      according to the priorities set forth within the Code.  It is from this central
        core of estate property that the debtor's creditors will be paid.
18
19      In order to achieve these goals, it is necessary and desirable that the
        property included in the bankruptcy estate be as inclusive as possible.
20      Congress's intent to define property of the estate in the broadest possible
        sense is evident from the language of the statute, which initially defines
21      the scope of estate property to be all legal or equitable interests of the
        debtor in property as of the commencement of the case, wherever
22      located and by whomever held. It would be hard to imagine language that
        would be more encompassing. Yet the remainder of section 541(a)
23
24  _____

25      [7] Sections 301, 302 and 303 of the Bankruptcy Code provide respectively that a voluntary
    case under a chapter of the Code, a joint bankruptcy case under a chapter of the Code, and an
26  involuntary bankruptcy case under Chapter 7 or 11 of the Code are commenced with the filing of
    a bankruptcy petition.  11 U.S.C. §§ 301-303.  These references are generally applicable and
27  inclusive of Chapter 11.  11 U.S.C. § 103; *see also, In re Gbadebo,* 431 B.R. at 229; *In re
    Stephens,* 445 B.R. at 820-821; *In re Friedman,* 466 B.R. at 488-489 (Jury, J., dissenting).
28

1    attempts to do just that. . . . Thus, section 541(a) defines everything that
2    is included in property of the estate.

3    5 Resnick & Sommer, *Collier on Bankruptcy* ¶ 541.01 at 541-10; *see also* Baird, *The*

4    *Elements of Bankruptcy* at 16 ("Section 541 defines the central concept of the *property of*

5    *the estate.*") (italics in original).

6        By its very language, § 1115 does not create the bankruptcy estate of an individual

7    Chapter 11 debtor.  11 U.S.C. § 1115.  That is accomplished by § 541(a) for individual

8    debtor Chapter 11 cases as well as other cases under the Bankruptcy Code.  11 U.S.C.

9    § 541(a); *In re Gbadebo,* 431 B.R. at 229; *In re Stephens,* 445 B.R. at 820-821; *In re*

10   *Friedman,* 466 B.R. at 488-489 (Jury, J., dissenting).  Thus, § 1115 by its very language

11   does not supplant or replace § 541(a) in creating the bankruptcy estate in a Chapter 11

12   case of an individual debtor and in defining most of the property of the bankruptcy estate

13   in such a case (i.e., all prepetition legal or equitable interests of the debtor).  *Id.; also*

14   *compare* 11 U.S.C. § 541(a) *with* 11 U.S.C. § 1115(a).  In this regard, the court disagrees

15   with the statement in *Shat* that "Section 1115 creates a baseline estate of all the property

16   covered by Section 541."  *In re Shat,* 424 B.R. at 863.  As discussed herein, § 541 does

17   that itself as expressed in the plain language of that provision because it, not § 1115,

18   creates an estate and defines property of the estate for all cases under the Bankruptcy

19   Code, including Chapter 11 cases, both for individual and entity debtors.  11 U.S.C.

20   § 541(a); *see also* 11 U.S.C. § 103(a) (provisions of Chapter 5, including, § 541(a) apply

21   to Chapter 11); *In re Gbadebo,* 431 B.R. at 229; *In re Stephens,* 445 B.R. at 820-821; *In*

22   *re Friedman,* 466 B.R. at 488-489 (Jury, J., dissenting), *citing In re Gelin,* 437 B.R. at 442

23   (stating that since neither § 103(a) nor § 541 was amended by BAPCPA, "there is no

24   reason for § 1115 to 'absorb' and 'supersede' § 541 to define property of the estate for

25   individual chapter 11 cases").   Moreover, the word "creates" is noticeably absent in

26   § 1115.  11 U.S.C. § 1115.  The "baseline" estate of an individual Chapter 11 debtor

27   consisting of the all prepetition legal or equitable interests of the debtor is created by

28   § 541(a), which is consistent with the language and general purpose of that statutory

1    provision.  11 U.S.C. § 541(a); 5 Resnick & Sommer, *Collier on Bankruptcy* ¶ 541.01 at

2    541-10; *In re Gbadebo,* 431 B.R. at 229-230.

3          The court agrees with *Stephens*, which recognized the phrase "all property of the

4    kind specified in section 541" as part of the preamble of § 1115(a) in adopting the narrow

5    view of the statute.  445 B.R. at 820-821.  As discussed previously, the bankruptcy estate

6    of an individual debtor in a Chapter 11 case is created under § 541(a), which specifies

7    that the estate consists of all prepetition legal and equitable interests of the debtor.  11

8    U.S.C. § 541(a).  Thus, these property interests are already part of the bankruptcy estate

9    by virtue of § 541(a).  The first part of § 1115(a) referring to § 541 property looks and acts

10   like a preamble because by using the words "in addition to," it sets a context for the

11   addition of two different items not covered by § 541(a) to the bankruptcy estate of an

12   individual debtor in Chapter 11, namely, postpetition assets and postpetition earnings.

13         The statutory language and numbering of § 1115(a) show that these two additional

14   items are "*in addition to the property specified in section 541*."  § 1115 (emphasis added).

15   "Accordingly . . . §§ 1129(b)(2)(B)(ii) and 1115 are most naturally understood to add to

16   the property already defined in § 541 the property which the debtor acquires postpetition."

17   *In re Friedman*, 466 B.R. at 488 (Jury, J., dissenting).  Before and after BAPCPA, all

18   prepetition legal and equitable interests of the debtor are property of the bankruptcy

19   estate under § 541(a).  Section 1115(a) simply adds two new kinds of property to the

20   bankruptcy estate that were created and defined by § 541(a).  *See In re Kamell*, 451 B.R.

21   at 512, *In re Lindsey*, 453 B.R. at 904; *In re Karlovich*, 456 B.R. at 681; *In re Gbadebo*,

22   431 B.R. at 230.  "Section 1115(a) brings into the estate a debtor's postpetition property

23   expressly excluded by § 541."  *In re Friedman,* 466 B.R. at 488 (Jury, J., dissenting),

24   *citing,* 11 U.S.C. § 541(a)(6) (carving out postpetition earnings from services performed

25   by an individual debtor after the commencement of the case) and § 541(a)(7) (making

26   property of the estate any interest in property that the estate (not the debtor) acquires

27   after the case).

28

1    Section 1115(a) is not the exclusive definition of property of the estate of an

2  individual Chapter 11 debtor because the statutory language is not structured that way.

3  Both statutes define property of the bankruptcy estate, and both statutes have the

4  heading, "Property of the estate."  11 U.S.C. §§ 541 and 1115.  Section 1115 does not

5  define property of the estate of an individual Chapter 11 debtor exclusively as shown by

6  use of the word, "includes," which is not a word of limitation.   The reference to § 541 is a

7  preamble in nature to state the context for adding the two additional items of property to

8  the estate.  *In re Stephens,* 445 B.R. at 820-821; *accord, In re Lindsey,* 453 B.R. at 899.

9  If § 1115(a) were to be considered the exclusive definition of property of the estate for an

10  individual Chapter 11 debtor, the categories of property would have simply enumerated

11  (1), (2) and (3) and specifically described as categories of property of the estate or the

12  statute would have only stated the verb, "includes," without the prepositional phrase, "in

13  addition to."

14    Use of the phrase "in addition to the property specified in section 541" in § 1115

15  clarifies that property of the estate is also created by § 541 because there might be an

16  ambiguity if such phrase is omitted.  That is, without such phrase, since § 1115

17  specifically states that it applies "in a case in which the debtor is an individual" and it

18  describes only two types of assets, it might have been erroneously construed that those

19  were the only two types of assets in the Chapter 11 bankruptcy estate of an individual.

20  The specification of § 541 in the phrase, "in addition to the property specified in section

21  541," in § 1115(a) ensures that parties are aware that other property is considered

22  property of the estate through another provision of the Bankruptcy Code.

23    As stated previously, "It is 'a cardinal principle of statutory construction' that 'a

24  statute ought, upon the whole, to be so construed that, if it can be prevented, no clause,

25  sentence, or word shall be superfluous, void, or insignificant.'"  *TRW Inc. v. Andrews*, 534

26  U.S. at 31 (citation omitted).  If the court were to adopt the Debtors' suggested

27  interpretation of § 1115 based on the broad view, it would render § 541 entirely

28  superfluous in individual Chapter 11 cases without any clear indication from Congress

that such a result was intended.   As discussed herein, the Debtors' interpretation also

fails to give effect to the words of § 1115(a), "in addition to."  Thus, in this court's view,

the property of an individual debtor in a Chapter 11 bankruptcy case consists of:

(1) § 541 property, i.e., all prepetition legal and equitable interests of the debtor;

(2) § 1115(a)(1) property, i.e., all postpetition legal and equitable interests of the debtor;

and (3) § 1115(a)(2) property, i.e., postpetition earnings of the debtor.[8]

Thus, reading §§ 1129(b)(2)(B)(ii) and 1115 together in light of the grammatical

structure of the statutory language, and giving effect to the meaning of each word or

phrase of these statutes, makes it clear that the absolute priority rule *is* applicable in

individual Chapter 11 debtor cases, and it limits the Debtors' retention of property in a

cramdown to the two classes of property specifically enumerated in § 1115(a)(1) and (2).

### iv.    Legislative History

As discussed below in this and subsequent sections of this memorandum

decision, the court's analysis of the impact of the BAPCPA amendments in §§ 1115 and

1129(b)(2)(B)(ii) on the absolute priority rule affecting individual Chapter 11 debtors

includes, in addition to the analysis specified in the preceding section based on an

examination of the language and grammar of these statutes---(1) a review of the

legislative history of BAPCPA; (2) policy considerations regarding the abrogation of the

absolute priority rule on Chapter 11 theory and practice; and (3) an assessment of the

weight of the case law.

The Supreme Court has given guidance in reconciling various sections within the

Bankruptcy Code in light of the BAPCPA amendments.  For example, with respect to

BAPCPA Chapter 13 amendments, the Supreme Court has stated that it "will not read the

---

[8] The court takes no position as to whether the absolute priority rule applies to property claimed as exempt since this issue was not raised, nor briefed, by the parties.  Given the court's ruling on the absolute priority rule as to property of the estate in general, the court need not address the issue.  *See In re Bullard,* 358 B.R. 541, 545 (Bankr. D. Conn. 2007); 7 Resnick & Sommer, *Collier on Bankruptcy,* ¶ 1129.04[4][a] at 1129-137; Alan M. Ahart, *The Absolute Abolition of the Absolute Priority Rule in Individual Chapter 11 Cases,* 31 Cal. Bankr. J. 731, 737-741 (2011).

40

1    Bankruptcy Code to erode past bankruptcy practice absent a clear indication that

2    Congress intended such a departure." *Hamilton v. Lanning*, 130 S.Ct. 2464, 2473 (2010)

3    (internal quotations omitted); *see also* Klee, *Bankruptcy and the Supreme Court* at 24-25

4    & n.89 (collecting cases for this proposition).

5         With respect to the relevant legislative history of §§ 1115 and 1129(b)(2)(B)(ii) as

6    added by BAPCPA, some courts have found it to be "scarce, equivocal and altogether

7    unhelpful." *In re Kamell*, 451 B.R. at 509.   On Section 321 of BAPCPA, which adds

8    § 1115(a) and amends § 1129(b)(2)(B)(ii), the House Judiciary Committee report stated:

9         Section 321(a) of the Act creates a new provision under chapter 11 of the
         Bankruptcy Code specifying that property of the estate of an individual
10        debtor includes, in addition to that identified in section 541 of the
         Bankruptcy Code, all property of the kind described in section 541 that
11        the debtor acquires after commencement of the case, but before the case
         is closed, dismissed or converted to a case under chapter 7, 12, or 13
12        (whichever occurs first). In addition, it includes earnings from services
         performed by the debtor after commencement of the case, but before the
13        case is closed, dismissed or converted to a case under chapter 7, 12, or
         13. Except as provided in section 1104 of the Bankruptcy Code or the
14        order confirming a chapter 11 plan, section 321(a) provides that the
         debtor remains in possession of all property of the estate.
15        . . .

16        Section 321(c) also amends section 1129(b)(2)(B)(ii) of the Bankruptcy
         Code to provide that an individual debtor may retain property included in
17        the estate under section 1115 (as added by the Act), subject to section
         1129(a)(14).

18

19    H.R. Rep. No. 109-31, pt. 1 at 80 (2005).  Thus, the legislative history specifically

20    referencing the addition of § 1115 and the amendment of § 1129(b)(2)(B)(ii) in BAPCPA

21    as reflected in the House committee report is unhelpful because it simply restates the

22    statutory language.  *Id.; see also, In re Kamell*, 451 B.R. at 509.

23        What legislative history does exist, however, actually reinforces the idea that "the

24    purpose behind BAPCPA was to have debtors pay more, not less." *In re Friedman*, 466

25    B.R. at 490 (Jury, J., dissenting), *citing In re Kamell*, 451 B.R. at 508; *see also In re*

26    *Lindsey*, 453 B.R. at 904-905; *In re Gbadebo,* 431 B.R. at 229.  As reflected in the House

27    Judiciary Committee Report for BAPCPA, the primary purpose of BAPCPA is "to improve

28

1  bankruptcy law and practice by restoring personal responsibility and integrity in the

2  bankruptcy system and ensure that the system is fair for both debtors and creditors."

3  H.R. Rep. No. 109-31, part 1 at 2 (2005), 2005 WL 832198, at *2, *quoted in In re Lindsey,*

4  453 B.R. at 904.

5      Moreover, as the House Report stated, Congress cited four general factors for

6  enacting BAPCPA.  H.R. Rep. No. 109-3(I), part 1 at 3-5 (2005), 2005 WL 832198, at *2-

7  3, *cited in In re Lindsey,* 453 B.R. at 904-905.  First, Congress noted "the recent

8  escalation of consumer bankruptcy filings," which had resulted in the "growing perception

9  that bankruptcy relief may be too readily available and is sometimes used as a first

10  resort, rather than a last resort." H.R. Rep. No. 109-31(I), part 1 at 3-4.  Second,

11  Congress referenced the "significant losses asserted to be associated with bankruptcy

12  filings," which are said to be passed on to "responsible Americans who live up to their

13  financial obligations."  *Id.* at 4.  Those losses may come in the form of "higher down

14  payments, higher interest rates, and higher costs for goods and services."  *Id.* at 4.  Third,

15  Congress stated that "the present bankruptcy system has loopholes and incentives that

16  allow and–sometimes–even encourage opportunistic personal filings and abuse."  *Id.* at

17  5. Fourth, Congress stated that "some bankruptcy debtors are able to repay a significant

18  portion of their debts, according to several studies.  Current law, however, has no clear

19  mandate requiring these debtors to repay their debts."  *Id.*  This legislative history of

20  BAPCPA has led a number of courts to adopt the narrow view of § 1115 because the

21  overall purpose of BACPA was to "ensure that debtors who can pay back a portion of

22  their debts do so."  *In re Gbadebo,* 431 B.R. at 229; *see also In re Kamell,* 451 B.R. at

23  508; *In re Lindsey,* 453 B.R. at 904-905.

24      At least one court favoring the broad view of § 1115 apparently suggests that

25  Congress abrogated the absolute priority rule for individual debtors in Chapter 11 to

26  further an individual debtor's fresh start.  *In re Shat,* 424 B.R. at 866-867, *citing inter alia*

27  *Marrama v. Citizens Bank of Massachusetts,* 549 U.S. 365, 367 (2007) and *Grogan v.*

28  *Garner,* 498 U.S. 279, 286 (1991); *see also,* Andrew G. Balbus, *Does the Absolute*

*Priority Rule Apply to Individuals in Chapter 11?,* Norton J. Bankr. L. & Pract. 1 Art. 4 (2011) ("Perhaps the most important policy objective in Chapter 11 is to provide a debtor with a fresh start.") (footnote omitted); *but see, Bank of America National Trust & Savings Assn. v. 203 North LaSalle Street Partnership,* 526 U.S. at 453 (listing "the two recognized policies underlying Chapter 11, of preserving going concerns and maximizing property available to satisfy creditors").  However, as the court in *Gbadebo* observed, "No one who reads BAPCPA as a whole can reasonably conclude that it was designed to enhance the individual debtor's 'fresh start.'"  *In re Gbadebo,* 431 B.R. at 229.  "Each one of these new provisions [of BAPCPA to make individual Chapter 11 cases to look more like Chapter 13 cases] appears designed to impose greater burdens on individual chapter 11 debtor's rights so as to ensure a greater payout to creditors."  *Id.*  "This was a frequently expressed overall purpose of BAPCPA, i.e., to ensure that debtors who can pay back a portion of their debts do so."  *Id.*  These new provisions included defining an individual debtor's postpetition income as property of the estate under § 1115 and requiring such income to be committed to pay creditors under the plan under § 1129(a)(15).  11 U.S.C. §1115 and 1129(a)(15).  The legislative history of BAPCPA (i.e., the House Report, H.R. Rep. No. 109-31(I)) does not support the suggestion that Congress wanted to enhance an individual debtor's fresh start.  H.R. Rep. No. 109-31(I), part 1 at 2-5 (2005), 2005 WL 832198, at *2-3, *cited in In re Lindsey,* 453 B.R. at 904.  Thus, in other words, based on this legislative history, it is incongruous to conclude that Congress intended to relax plan confirmation standards for individual Chapter 11 debtors by removing the creditor protection of the absolute priority rule and thereby allowing these debtors to retain their prepetition assets and cram down unsecured creditors.  *In re Gbadebo,* 431 B.R. at 229; *see also In re Kamell,* 451 B.R. at 508-512: *In re Lindsey,* 453 B.R. at 904-905.

        The court also notes that Section 321 of BAPCPA, which added § 1115 to the Bankruptcy Code, including the statutory language at issue in this case, was enacted as part of Title III of BAPCPA and is entitled *Discouraging Bankruptcy Abuse.*  Pub. L. No.

1    109-8, 119 Stat. 23 (2005); *Florida Department of Revenue v. Piccadilly Cafeterias, Inc.,*

2    554 U.S. at 47 ("statutory titles and section headings are tools available for the resolution

3    of a doubt about the meaning of a statute") (citation and internal quotation marks

4    omitted); 2A Singer & Singer, *Statutes and Statutory Construction*, § 47.3 at 289-290 &

5    nn.15-16 (title of a statutory act may be some indicia of legislative intent).  The broad

6    view of § 1115, which eliminates the creditor protection of the absolute priority rule for

7    individual Chapter 11 debtors, is an ironic reading of BAPCPA in light of the general

8    purposes of BAPCPA and new § 1115 being part of a title of the Act to discourage

9    bankruptcy abuse.

10         Given that there is no indication in the legislative history that Congress intended to

11    abrogate the absolute priority rule as to individual Chapter 11 debtors as to all of their

12    prepetition property, and given that the general purposes of BAPCPA cited by Congress

13    were to curb perceived abuses by debtors, it is incorrect to read §§ 1129 and 1115 in

14    such a way as to fully abrogate the absolute priority rule for individual Chapter 11

15    debtors.  *In re Gbadebo*, 431 B.R. at 229-230; *In re Kamell,* 451 B.R. at 507-511; *In re*

16    *Lindsey,* 453 B.R. at 904-905; *In re Karlovich,* 456 B.R. at 681-682; *In re Friedman*, 466

17    B.R. at 490 (Jury, J., dissenting).

18           **v.**     **Policy Considerations**

19         Finally, strong policy considerations require the application of the absolute priority

20    rule to individual Chapter 11 cases.  As explained in *Kamell*,

21         After BAPCPA, the debtor facing opposition of any one unsecured
     creditor must devote 5 years worth of "projected disposable income," at a
22         minimum (or longer if the plan is longer). But debtor is not compelled to
     give also his additional earnings or after-acquired property net of living
23         expenses beyond five years unless the plan is proposed for a period
     longer than five years. But there is no compelling reason to also conclude
24         that *pre*petition property need not be pledged under the plan as the price
     for cram down, just as it has always been. This does unnecessary
25         violence to well-established jurisprudence.

26    *In re Kamell*, 451 B.R. at 511; *see also Northern Pacific R. Co. v. Boyd,* 228 U.S. at 508;

27    *Louisville Trust Co. v. Louisville, N.A. & C.R. Co.,* 174 U.S. at 684; *Norwest Bank*

28    *Worthington v. Ahlers,* 485 U.S. at 202; *Bank of America National Trust & Savings Assn.*

*v. 203 North LaSalle Street Partnership,* 526 U.S. at 444-445; *In re Perez*, 30 F.3d at 1214; *Warren, A Theory of Absolute Priority at 37-38;* Baird, *The Elements of Bankruptcy* at 86.

If Congress had not amended § 1129(b)(2)(B)(ii) to soften the impact of the absolute priority rule on individual Chapter 11 debtors, individual debtors would be unable to retain *any* postpetition earnings or property now included in the estate under § 1115(a)(1) and (2) in a cramdown plan unless they were able to negotiate an agreement with their creditors or pay the claims of the dissenting creditors in full. *See In re Perez,* 30 F.3d at 1212-1231. "Obviously, forfeiting all post-petition income would have been at least difficult if not impossible in almost all individual cases.  So, the 'absolute priority rule' had to be amended to let the debtor keep enough of his post petition earnings to sustain his livelihood." *In re Kamell,* 451 B.R. at 511*.* Thus, with the creation of § 1115 and the exclusion of postpetition property from § 1129(b)(2)(B)(ii), Congress struck a careful balance between the rights of an individual debtor to cram down and the rights of creditors to be given fair and equitable treatment.

The narrow reading of § 1115 respects this fine-tuned balance.  The broad view does not because it essentially abrogates the absolute priority rule for an individual Chapter 11 debtor as to all of the debtor's prepetition assets, which disrupts, if not destroys, the fine-tuned balance between the rights of a Chapter 11 debtor and the creditors without support in the structure or statutory language of the Bankruptcy Code, and §§ 541 and 1115 in particular. *See Florida Department of Revenue v. Piccadilly Cafeterias, Inc.,* 554 U.S. at 51, *citing Toibb v. Radloff,* 501 U.S. at 163.  This result is accomplished by a change in the fundamental dynamic of Chapter 11 of creditor consent and negotiation for individual debtor cases under the broad view because it assumes cramdown in plan confirmation by allowing the debtor to retain prepetition property without having to comply with the absolute priority rule.  There is no need for an individual debtor-in-possession to negotiate with creditors to seek their consent and solicit their votes for a reorganization plan if the debtor knows in advance that he or she can resort to

1    cramdown and keep his or her prepetition property regardless of any vote in a plan

2    confirmation process.   *In re Gbadebo,* 431 B.R. at 230 ("Finally, if §§ 1129(b)(2)(B)(ii)

3    and 1115 are read to eliminate the 'absolute priority' rule for individual chapter 11

4    debtors, the Court is faced with a procedural anomaly.   If the plan proposes to pay them

5    anything, the debtor is required to send them a ballot.   Yet, their vote can be ignored.

6    This makes no sense."); *contra, In re Friedman,* 466 B.R. at 483-484.[9]   In effect, the

7    broad view removes the creditor protection of the absolute priority rule, which in this

8    court's view heightens the danger recognized by the Congress and the Supreme Court in

9    *203 North LaSalle Street Partnership* that the plan will simply turn out to be too good a

10   deal for the debtor's owners.   *Bank of America National Trust & Savings Assn. v. 203*

11   *North LaSalle Street Partnership,* 526 U.S. at 444-445, *citing* H.R. Doc. No. 93-137, pt. I,

12   p.255.

13          As the court in *Kamell* points out regarding the argument that the narrow view

14   prohibits individual debtors from confirming a Chapter 11 plan, it does no such thing.   *In*

15   *re Kamell*, 451 B.R. at 512.   Creditor consent is the heart of Chapter 11, and individual

16   debtors can negotiate consensual plans in Chapter 11, which may not pay the claims of

17   unsecured creditors in full.   As the court in *Gbadebo* pointed out, "such a plan may be

18   confirmed if the holders of such claims vote in favor of the plan."   431 B.R. at 229.   "They

19   are likely to do so if a reasonable dividend is proposed and they conclude that they will

20   receive no dividend in a chapter 7 case."   *Id.* at 229-230.   Alternatively, individual Chapter

21   11 debtors can resort to cramdown if they satisfy the absolute priority rule as was the

22   case before the 2005 Bankruptcy Code amendments of BAPCPA by paying the claims of

23   _____

24          [9] The court agrees with the court in *Gbadebo* and disagrees with the BAP in *Friedman* on this
     point because under the broad view, individual debtors can and will approach creditor
     negotiations with the premise that they can keep their prepetition property without having to

25   comply with the absolute priority rule as long as they meet the "best interests" test of
     § 1129(a)(7)(i.e., distribute more than in a Chapter 7 liquidation case) and commit their projected

26   disposable income for no less than five years, no matter how minimal it may be, under
     § 1129(a)(15), thus, the reality is that the votes of a dissenting class of creditors can be ignored

27   because debtors get to keep their prepetition property.   Abrogation of the absolute priority rule
     would thus have the effect of altering the fundamental dynamic of the Chapter 11 process.

28

dissenting creditors in full.  *In re Kamell,* 451 B.R. at 512*; see also In re Gbadebo,* 431

B.R. at 229-230.   In doing so, as recognized by the narrow view of § 1115, BAPCPA

provides a limited exception to the absolute priority rule by permitting cramdown under

§ 1129(b)(2)(B)(ii) as amended by BAPCPA to allow individual debtors to keep their

postpetition earnings and postpetition assets without paying dissenting creditors in full as

otherwise required under the absolute priority rule.   Retention of postpetition earnings

and property under a plan by an individual debtor does not violate the absolute priority

rule under the BAPCPA exception under amended § 1129(b)(2)(B)(ii).

The argument for the broad view of § 1115 is that this would enable

manager/owners of businesses not eligible for Chapter 13 to reorganize their businesses

through Chapter 11.  *In re Roedemeier,* 374 B.R. at 273-276; *In re Shat,* 424 B.R. at 862-

865; *In re Friedman*, 466 B.R. at 481-484.   In other words, Congress must have intended

to make Chapter 11 for individuals more like Chapter 13.   This interpretation is not

supported by the structure of the statutory language as discussed above, nor is it

supported in the legislative history of BAPCPA, which shows the purpose was to require

debtors to pay more.   As the court observed in *Karlovich,* if Congress meant to provide

the protections of Chapter 13 to more debtors who are manager/owners of businesses, it

could have simply raised the debt limits of Chapter 13, which are currently set at

$360,475 for unsecured debts and $1,081,400 for secured debts.   *In re Karlovich*, 456

B.R. at 682; 11 U.S.C. § 109(e).   The absolute priority rule does not apply in Chapter 13

cases, and the debt limits of Chapter 13 serve to restrict reorganization without the

creditor protection of the absolute priority rule to debtors with limited debt levels.

The broad view removes the creditor protection of the absolute priority rule in

Chapter 11 cases as to individual debtors because there are no debt limits in Chapter 11.

Thus, the broad view would allow highly leveraged individuals who are not eligible for

Chapter 13 to qualify for Chapter 11 reorganization by allowing them to retain their

prepetition property without having to satisfy the absolute priority rule, no matter how

much debt they had incurred.   In this court's view, this interpretation does violence to the

1   delicate balance between creditors and debtors in Chapter 11 and is not supported by the

2   structure and language of the Bankruptcy Code or the legislative history of the 2005

3   Code amendments in BAPCPA, and as the court in *Kamell* stated, "does unnecessary

4   violence to well-established jurisprudence."  *See In re Kamell*, 451 B.R. at 511; *see also*

5   *Florida Department of Revenue v. Piccadilly Cafeterias, Inc.,* 554 U.S. at 51, *citing Toibb*

6   *v. Radloff,* 501 U.S. at 163; *In re Friedman,* 466 B.R. at 490-491 (Jury, J. dissenting) ("the

7   broad view taken by the Panel destroys the careful balance between an individual

8   chapter 11 debtor's interest in reorganizing and restructuring his or her debts and the

9   creditor's interest in maximizing the value of the bankruptcy estate"), *citing Toibb v.*

10  *Radloff,* 501 U.S. at 163.  As the dissent in *Friedman* aptly observed,

11          Individual chapter 11 debtors are not simply chapter 13 debtors with
            larger debts. Rather, chapter 11 debtors, individuals or not, stay in
12          possession of their property and enjoy all the rights and powers of a
            trustee. They are authorized to operate their business and can choose to
13          extend their plan beyond five years. In exchange, the chapter 11 process
            does not leave unsecured creditors by the wayside by affording individual
14          chapter 11 debtors the luxury to retain all pre and postpetition property at
            their expense.
15
            . . .
16
            Individuals who own a business have the same opportunities as
17          corporate shareholders to take advantage of unsecured creditors.

18  *In re Friedman,* 466 B.R. at 491 (Jury, J., dissenting); *see also,* 11 U.S.C. §§ 1106-1108,

19  1129, 1322 and 1325; *see also, Bank of America National Trust & Savings Assn. v. 203*

20  *North LaSalle Street Partnership,* 526 U.S. at 444-445.

21          Thus, the court agrees with other courts adopting the narrow view that if Congress

22  intended to make a "momentous change" in the law by eliminating the absolute priority

23  rule, a central principle of Chapter 11 reorganization theory and practice, for individual

24  Chapter 11 debtors, it would have merited at least a mention in the legislative history,

25  which is silent on the issue.   *See, e.g., In re Gbadebo,* 431 B.R. at 229-230; *In re Kamell,*

26  451 B.R. at 509-512; *In re Lindsey,* 453 B.R. at 904-905; *see also, In re Shat,* 424 B.R. at

27  867; Warren, *A Theory of Absolute Priority* at 37-38; Baird, *The Elements of Bankruptcy*

28  at 66-86.

1     In this case, based on the Debtors' Schedules and the Amended Disclosure

2  Statement, the Debtors have over $4 million in unsecured debts and over $13 million in

3  secured debts, well in excess of the debt limits of Chapter 13 set forth in 11 U.S.C.

4  § 109(e), making them ineligible to file under that chapter.  *See In re Friedman,* 466 B.R.

5  at 491 (Jury, J., dissenting).  Without requiring the Plan to comply with the absolute

6  priority rule, the Debtors could write off about $3.5 million in unsecured debts, forcing

7  General Unsecured Creditors to take a loss of at least 85 cents on the dollar, while the

8  Debtors retain all prepetition and postpetition property, including an investment property

9  valued at $5,434,000 at a time that arguably may be the bottom of the real estate market.

10  Under the proposed Plan, the Debtors have unlimited upside potential for profit on their

11  prepetition and postpetition assets while U.S. Bank and other General Unsecured

12  Creditors must absorb the loss fixed under the proposed Plan.  *See In re Lively,* __ B.R.

13  __, 2012 WL 959286, at *6 & nn.9-10 (example illustrating the problem of a windfall fixing

14  "projected disposable income" as the standard for payment of unsecured creditors in an

15  individual Chapter 11 plan).  Under pre-BAPCPA law, the creditor protection of the

16  absolute priority rule would not have allowed this result.  *See, e.g., In re Perez*, 30 F.3d at

17  1214.

18     Excepting financially sophisticated individual Chapter 11 debtors with complex

19  personal investments, as here, from the absolute priority rule and allowing them to retain

20  such investments despite their overleveraging does not seem justified in light of the

21  legislative history of BAPCPA and what Congress sought to accomplish in that act.  This

22  situation in this case appears to be what Congress stated it intended to prevent with the

23  passage of BAPCPA. [10]  Unlike Chapter 13, which has debt limits on the amount of

24  _____

25  [10] The House Report made the following statement in this vein:  "Second, there are significant
losses associated with bankruptcy rulings.  As one witness explained during the Senate Judiciary
Committee's hearing on S. 256 earlier this year: 'Like all other business expenses, when creditors

26  are unable to collect debts because of bankruptcy, some of those losses are inevitably passed on
to responsible Americans who live up to their financial obligations.  Every phone bill, electric bill,

27  mortgage, furniture purchase, medical bill, and car loan contains an implicit bankruptcy 'tax' that
the rest of us pay to subsidize those who do not pay their bills.  Exactly how much of these

28

1   secured and unsecured debt and attendant potential losses that are passed on to

2   creditors, the broad view results in potentially unlimited losses that are passed on to

3   unsecured creditors from the writing down of debt in cramdown plans of individual

4   Chapter 11 debtors.

5          A majority of the courts that have ruled on the issue of whether § 1115 should be

6   viewed narrowly or broadly have supported the narrow view holding that the absolute

7   priority rule applies in Chapter 11 bankruptcy cases of individual debtors. *In re Gbadebo,*

8   431 B.R. at 227-230; *In re Mullins,* 435 B.R. at 359-361; *In re Gelin,* 437 B.R. at 440-443;

9   *In re Stephens,* 445 B.R. at 820-821; *In re Walsh,* 447 B.R. at 49; *In re Maharaj,* 449 B.R.

10  at 491-494; *In re Draiman,* 450 B.R. at 820-822; *In re Kamell,* 451 B.R. at 507-512; *In re

11  Lindsey,* 453 B.R. at 891-905; *In re Karlovich,* 456 B.R. at 679-682; *In re Lively,* ___ B.R.

12  ___, 2012 WL 959286, at *7; *see also In re Friedman,* 466 B.R. at 484-492 (Jury, J.,

13  dissenting).  Only a minority of courts have adopted the broad view holding that the

14  absolute priority rule does not now apply in individual Chapter 11 bankruptcy cases. *In re

15  Roedemeier,* 374 B.R. at 273-276 & nn.15-19; *In re Tegeder,* 369 B.R. at 479-481

16  (Bankr. D. Neb. 2007); *In re Shat,* 424 B.R. at 862-868; *SPCP Group, LLC v. Biggins,*

17  465 B.R. at 320-324; *In re Friedman,* 466 B.R. at 480-484.  The evolving majority in

18  support of the narrow view reinforces this court's conclusion that that Congress did not

19  abrogate the absolute priority rule for Chapter 11 cases of individual debtors in enacting

20  BAPCPA.

21         Thus, the structure and statutory language of the Bankruptcy Code, the legislative

22  history of BAPCPA, strong policy considerations, and the weight of the case law, in

23  _____

24  bankruptcy losses is passed on from lenders to consumer borrowers is unclear, but economics
    tells us that at least some of it is.  We all pay for bankruptcy abuse in higher down payments,

25  higher interest rates, and higher costs for goods and services."  H.R. Rep. No. 109-31, part 1, at
    3-5, 2005 WL 832198, at *2-3, quoted in *In re Lindsey,* 453 B.R. at 904.  In light of such

26  legislative statements, the court does not agree that Congress intended to abrogate the creditor
    protection of the absolute priority rule to allow individual debtors to rid themselves of burdensome

27  prepetition debt while being able to retain their prepetition assets.  See, e.g., *In re Gbadebo,* 431
    B.R. at 229-230; *In re Kamell,* 451 B.R. at 509-512; *In re Lindsey,* 453 B.R. at 904-905.

28

1  support of the narrow interpretation of § 1115 lead this court to conclude that the absolute

2  priority rule still applies in Chapter 11 cases of individual debtors as to prepetition

3  property of the bankruptcy estate covered under § 541.

4        **C.**      **The Debtors' Plan Violates the Absolute Priority Rule**

5        Under the narrow view of § 1115, which this court adopts, prepetition property is

6  unaffected by § 1115 for purposes of § 1129(b)(2)(B)(ii) and may not be retained unless

7  senior classes of claims are paid in full or unless all senior classes vote to accept the

8  proposed Plan.  The Debtors, however, have retained their interests in their prepetition

9  assets without paying senior creditors in full under the proposed Plan.  Specifically, the

10  Debtors have left their interests unimpaired and propose that all property (prepetition and

11  postposition) will revest in a revocable trust controlled by the Debtors after plan

12  confirmation.  This proposition is impermissible given that the conditions in

13  § 1129(b)(2)(B) are not satisfied, and the court will therefore deny approval of the

14  Amended Disclosure Statement.

15  **CONCLUSION**

16        The court finds that the Amended Disclosure Statement cannot be approved

17  because it contains inadequate information and because it describes a plan that may not

18  confirmed.   Accordingly, approval of the Amended Disclosure Statement must be

19  **DENIED**.  A separate order is being filed concurrently herewith

20  ###

21

22

23

24

DATED: May 17, 2012

25                              United States Bankruptcy Judge

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*) **MEMORANDUM DECISION RE DENIAL OF APPROVAL OF THE DEBTORS' AMENDED DISCLOSURE STATEMENT** was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I.  SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of **May 17, 2012**, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below:

- James C Bastian    jbastian@shbllp.com
- Mark Bradshaw    mbradshaw@shbllp.com
- Melissa Davis    mdavis@shbllp.com
- Todd S Garan    ecfcacb@piteduncan.com
- Joseph Garibyan    cmartin@pralc.com
- Brian T Harvey    bharvey@buchalter.com, IFS_filing@buchalter.com;rreeder@buchalter.com
- Robert E Huttenhoff    rhuttenhoff@shbllp.com
- Ori Katz    okatz@sheppardmullin.com
- Rika Kido    rkido@shbllp.com
- Alvin Mar    alvin.mar@usdoj.gov
- Jeannette Marsala    jmarsala@pralc.com, cmartin@pralc.com
- Christopher M McDermott    ecfcacb@piteduncan.com
- Dace Pavlovskis    Dace.Pavlovskis@sba.gov
- Cassandra J Richey    cmartin@pprlaw.net
- Ramesh Singh    claims@recoverycorp.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Melissa A Vermillion    cmartin@pprlaw.net
- Anne Wells    wellsanne@earthlink.net

**II.  SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by the clerk of the court by United States Mail, first class, postage prepaid, to the following person(s) and/or entity(ies) at the address(es) indicated below:

**Debtors:**
David and Grace Arnold
4819 Lido Sands Dr
Newport Beach, CA 92663

Steve High
Coldwell Banker
140 Newport Center Drive, Suite 100
Newport Beach, CA 92660

IRS
Department of the Treasury
Internal Revenue Service
Mail Stop 5503 24000 Avila Road
Laguna Nigel, CA 92677

**III.  TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s), and/or email address(es) indicated below: